UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

―――――――――――――――――――――――

CAROLETTE MEADOWS,

       Plaintiff,

    v.

BUFFALO POLICE DEPARTMENT, *et al.*,

       Defendants.

―――――――――――――――――――――――

21-CV-449-LJV-HKS
DECISION & ORDER

On March 29, 2021, the *pro se* plaintiff, Carolette Meadows, commenced this action under 42 U.S.C. §§ 1981-1983 and 1985-1986 and the Americans with Disabilities Act ("ADA").  Docket Item 1.  Meadows says that her neighbor, Rachel Eckert, violated her rights under those statutes and the Fair Housing Act ("FHA") over the course of a long-running feud between them.  *See* Docket Item 44.  And Meadows says that local law enforcement and county prosecutors inadequately responded to her complaints about Eckert while giving undue weight to Eckert's grievances.  *See id.*

    On October 18, 2021, Eckert moved to dismiss the complaint.  Docket Item 8.  A few weeks later, defendants Erie County, John Flynn, Milton Gordon, John Schoemick,[1] and Ankur Singh (the "Erie County defendants") also moved to dismiss.  Docket Items 13, 16, 19, 22, 25.  When Meadows responded to those motions in January 2022, she also filed an amended complaint and "supplemental pleading."  Docket Items 42-46.

―――――――――――――――――――――

[1] Although the complaint names "John Schoemic" as a defendant, his last name apparently is spelled "Schoemick."  *See* Docket Item 56.  The Clerk of the Court shall correct the caption accordingly.

The parties disputed the timeliness of Meadows's amended complaint, *see* Docket Items 47 and 48, but this Court accepted the amended complaint as timely filed and extended the defendants' time to respond to it, *see* Docket Item 52.  The Erie County defendants then renewed their motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), and Eckert moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).[2]  Docket Items 54, 56, 58, 60, 62, 78.  Both sides then fully briefed those motions.  Docket Items 77, 85, 88-92.

After the motions were fully briefed, Meadows moved to amend her complaint once again.  Docket Item 93.  The Erie County defendants and Eckert opposed that motion.  Docket Items 95, 96, 102.  Meadows then moved to amend her complaint still again and filed numerous other "amended claims" and "supplemental pleadings." Docket Items 97, 106, 109, 111, 125.[3]  Meadows also moved to strike certain filings,

---

[2] On April 18, 2022, Meadows moved to strike Eckert's motion for judgment on the pleadings "due to [Meadows] not having service and time to respond to the defense request."  Docket Item 87.  But Meadows responded to Eckert's motion on April 13, 2022, *see* Docket Item 85, which suggests both that Meadows was served with the motion and that she had sufficient time to respond to it.  Nevertheless, to address Meadows's claim that she did not have enough time to respond to the motion, this Court extended Meadows's time so that she could further respond to Eckert's motion.  *See* Docket Item 86.  But Meadows did not file another response to the motion.  Because Meadows has responded to Eckert's motion and was given an opportunity to respond further, Meadows's motion to strike is denied.

[3] This Court never gave Meadows permission to file these supplemental pleadings, and they do not appear to be permissible under the Federal Rules of Civil Procedure.  For example, Federal Rule of Civil Procedure 15(d) permits a supplemental pleading only "[o]n motion" and with "reasonable notice."  *See* Fed. R. Civ. P. 15(d). And because many of Meadows's allegations in those supplemental pleadings are undated, this Court cannot conclude that the allegations in those pleadings are the sort that are permissible under Rule 15(d).  *See id.* (noting that supplemental pleadings must "set[] out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented").

requested a preliminary hearing, and asked to withdraw her claims against some defendants.  Docket Items 87, 119, 120, 125.

For the reasons that follow, the Erie County defendants' motions to dismiss are granted in part.  And the remainder of the Erie County defendants' motions to dismiss as well as Eckert's motion for judgment on the pleadings will be granted unless Meadows files an amended complaint correcting the deficiencies noted below.

## FACTUAL BACKGROUND[4]

Meadows and Eckert, who reside next door to each other in Buffalo, New York, have a contentious relationship that has spawned numerous law enforcement

---

In any event, because Meadows may amend her complaint as provided below, this Court declines to consider the allegations in Meadows's supplemental pleadings and denies Meadows's motions to amend as moot.  Because the only claims dismissed below are those that "better pleading will not cure," *see Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (noting that leave to amend may be denied where amendment would be "futile"), even if this Court considered those filings, nothing in them would change the result here.

[4] The following facts are taken from the amended complaint, Docket Item 44.  In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) and a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), the court "accept[s] all factual allegations in the complaint as true and draw[s] all reasonable inferences in [the] plaintiff's favor."  *In re Thelen LLP*, 736 F.3d 213, 218 (2d Cir. 2013).

In addition to her amended complaint, Meadows also submitted several videos as exhibits.  *See* Docket Item 45.  Meadows does not describe those videos in her amended complaint or say who or what is depicted in them; instead, she simply attached them as "recordings."  *See* Docket Item 44 at 41.  The Court therefore declines to consider the video excerpts unless Meadows provides some further explanation of their significance.  Meadows may amend her complaint to explain how the exhibits she submitted relate to the factual allegations in her complaint.

investigations, multiple state court cases, and now two lawsuits in this Court.[5]
Meadows's and Eckert's mutual discontent apparently was sparked by a dispute about
a pipe attached to Eckert's house; that dispute in turn led to a protracted feud.  Although
Meadows's amended complaint covers a number of disparate incidents over the course
of more than a year, almost all those incidents follow a similar pattern:  Meadows and
Eckert got into some dispute; one or both of them called local law enforcement; and
local law enforcement and county prosecutors either minimized Meadows's grievances
or gave undue weight to Eckert's.

## I.      THE INITIAL PIPE DISPUTE

In March 2020, Eckert "install[ed] piping on her home that blocked Meadows from
removing her car from the driveway."  Docket Item 44 at 7.  After Eckert refused to
move the piping so that Meadows could access the driveway, Meadows "cut the pipe
and le[ft]."  *Id.* at 8.  Eckert then called 911 and falsely reported that Meadows was
"threatening" her.  *Id.*  Buffalo police officers responded to the scene, and Detective
McDermott ultimately "filed a warrant for Meadows [which] maintain[ed] that the pipe
was cut without cause."  *Id.*

Around that same time, Meadows "had washed and hung a tent out to dry which
was destroyed when she woke up the next morning."  *Id.*  Meadows asked Eckert
whether "she knew anything about the tent"; in response, Eckert "threatened to hit
Meadows in the head with a pipe."  *Id.* at 9.  Meadows called the police, but the

---

[5] Eckert has filed a separate case in this Court, raising claims against Meadows
and various other state and municipal defendants related to similar disputes.  *See*
W.D.N.Y. Case No. 22-cv-540.

responding officer "declined to file a report." *Id.*  After Eckert repeated similar threats on Facebook that night, Meadows again called the police.  *Id.*  This time, Officer Brown "wrote a complaint for harassment against Eckert for the threats," although another officer later changed that complaint to "a dispute form."  *Id.*

Eckert "remove[d] Meadows'[s] gate," which a Buffalo police officer "made her put back."  *Id.*  Eckert also claimed that much of Meadows's property belonged to her, "threaten[ed] Meadows numerous times," and "push[ed] [Meadows]."  *Id.*  Although Meadows tried to show a video of the incident to a Buffalo police officer, he "declar[ed] that he wasn't looking at any videos."  *Id.*  No charges were filed regarding this incident. *Id.* at 10.

Eckert then took to social media, where she "ma[de] several racially charged statements . . . claiming the dispute was because Eckert 'was white' and [] Meadows 'doesn't like white women.'"  *Id.*  Meadows also attached various social media posts to her amended complaint that show additional interactions between herself and Eckert.[6] For example, Eckert posted that Meadows was "really messing w[ith] the wrong one."[7] *Id.* at 54.  Eckert also remarked that Meadows's life would "go to shit"—if it had not already after Meadows's "husband left her for a white woman."  *Id.*  Meadows responded that Eckert should "just keep going with the slander."  *Id.*

Eckert also posted that Meadows "is racist af [sic]" and "doesn't like [Eckert]" because "[Eckert is] white."  *Id.* at 58.  Eckert "declar[ed] 'neighbor war'" on Meadows

---

[6] The attached social media posts were not made by an account with the name "Rachel Eckert."  *See, e.g.*, Docket Item 44 at 54.  Based on the context, the Court presumes that the posts are from Eckert.

[7] The posts are undated.

and said that "she 'would not stop,' and would[] 'destroy [Meadows's] whole life.'"[8]  *Id.* at 10.  Others "respond[ed] to Eckert's racially charged comments by saying that Meadows should be spit on, shot, beat with a bat, [or have] other violence inflicted upon her."  *Id.*

Meanwhile, the dispute over the pipe remained unresolved.  Buffalo city employees "asked [] Meadows to let Eckert reconnect the pipe so it wouldn't cause [carbon monoxide]" emissions.  *Id.*  Eckert also "posted on social media that she took her kids to the [emergency room] and they tested positive for [carbon monoxide]" and that she therefore "wanted Meadows arrested for attempted murder."  *Id.* at 11.  But Eckert was to blame because she had not "repair[ed] the cut pipe that was supposed to be a [carbon monoxide] risk."  *Id.*  So Meadows "called [Child Protective Services]" on Eckert,[9] and Eckert then fixed the pipe.  *Id.*

Although that should have ended the matter, sometime in April 2020 Meadows "noticed [that she had] difficulty breathing while in the driveway."  *Id.* at 13.  Meadows informed a Buffalo city inspector about this, but the inspector responded that "the fumes were 'only 5% [carbon monoxide].'"  *Id.*  After Meadows protested that this level of carbon monoxide was still too high, "Eckert was informed that she would need to move the pipe."  *Id.*  But Eckert "push[ed ]back" and the city "gave in[]."  *Id.*

---

[8] Meadows also alleges that Eckert has made other "social media posts" that "attack[] Meadows['s] disability status and question[] her medical history."  Docket Item 44 at 12.  Meadows "does not know how Eckert obtained her medical information."  *Id.*

[9] Meadows called the police three other times between March 28 and April 1, 2020.  Docket Item 44 at 11.  Each time, the responding officers rebuffed Meadows's complaints and instead "directed [Meadows] to cease and desist" calling law enforcement.  *Id.*

About four months later, Meadows "reached out to the Erie County Health Department regarding the furnace pipe and the fumes." *Id.* at 23. Defendant Singh "responded to her and informed [her] that despite the health department['s] being responsible for public health and air quality, they would not get involved with Eckert's pipe []or any possible ill effects from it." *Id.*

## II.   THE RESULTING PHYSICAL ALTERCATION

The dispute between Eckert and Meadows subsequently devolved into physical violence. On May 23, 2020, Meadows was "crouching near the ground[]" on the "disputed boundary between her property and Eckert's property." *Id.* at 15. Eckert then "walked up behind [Meadows], pushed the fence on top of her, and struck [Meadows] on the back of her head . . . and in the middle of [her] back with a cast iron skillet." *Id.* Meadows went to the hospital where she was treated for her injuries. *Id.* Although Buffalo police officers were called to the scene, they initially "declined to press charges against" Eckert and maintained that Eckert was "protecting her property." *Id.* at 16. After Meadows protested, an officer charged Eckert with assault and Meadows with trespassing and harassment. *Id.*

In July 2020, Meadows "went to Buffalo City Court to file the Felony Assault warrant card" for this incident. *Id.* at 18. Meadows obtained the card and left, but "the warrant clerk [then] called Meadows and told her to return to the court." *Id.* At that point, Meadows learned that "the [Assistant District Attorney ("ADA")] changed Eckert's charge from a felony to a misdemeanor." *Id.* Meadows "went upstairs" to protest this decision, but defendant Schoemick, the ADA then assigned to the case, told her that

Eckert's assault "can't be that serious" because Eckert "wasn't arrested." *Id.* Meadows "declined to accept the decreased charges." *Id.* at 19.

Upset with Schoemick's decision, Meadows staged a "daily protest of the [Erie County District Attorney's] office" during the first week of August 2020. *Id.* Meadows then was "called up to the [District Attorney's] office and met with Erie County investigators," who "refer[red] her case for prosecution to a new ADA." *Id.*

On August 13, 2020, defendant Gordon "reached out, via email, to inform Meadows that he was the new ADA" assigned to her case. *Id.* at 21. Meadows sent additional information about her issues to Gordon, but Gordon "never responded to [Meadows's] inquiry on [possible] charges against Eckert." *Id.* After Meadows "questioned Gordon about the racial bias being displayed by the [Erie County District Attorney's Office]," Gordon "told Meadows to 'be courteous' if she wanted to be deemed 'credible.'" *Id.* Meadows then filed a complaint about the Erie County District Attorney's Office with the New York State Attorney General. *Id.* Eckert ultimately was charged with a misdemeanor "despite Meadows['s] protest[s]." *Id.* at 22.

Meadows also "reached out to [Erie County District Attorney] John Flynn . . . numerous times in 2020 and 20[21] to inform him of the disparate/differential treatment" between Eckert's and Meadows's complaints about each other. *Id.* at 22. Meadows likewise repeatedly reached out to Flynn and Gordon in 2020 and 2021 in an attempt to "obtain their assistance in getting the [Buffalo Police Department] to follow through on the complaints she was making about Eckert." *Id.* at 28. Neither Flynn nor Gordon responded to Meadows's inquiries. *Id.* at 22, 28.

8

III.    MEADOWS'S OTHER CONFRONTATIONS WITH ECKERT

In addition to the pipe dispute and physical altercation, Meadows and Eckert had several other confrontations about their property boundary.[10]  *Id.* at 14, 20-21.  Eckert also falsely accused Meadows of "cut[ting] the lock off her shed, st[ealing] her grill, and st[ealing] hundreds of dollars['] worth of tools."  *Id.* at 17.  A Buffalo police officer then "g[ave] Eckert a warrant for Meadows for theft, trespass, and mischief even though Eckert had no proof" of the incident.  *Id.* at 18.  In August 2020, Eckert filed two more false complaints, now alleging that Meadows had cut the fence that divided their properties.  *Id.* at 20-21.

In November 2020, "Meadows observed Eckert pouring epoxy out of her window and onto the driveway."  *Id.* at 25.  About a month later, a responding police officer who was called to the area "refused to intervene" when Eckert "took Meadows'[s] panels and broke them."  *Id.* at 27.  About a month after that, Eckert stole two eight-foot wooden posts in Meadows's driveway.  *Id.* at 32.  And at one point in March 2021, Eckert "dump[ed] a bag of dog feces at the property line."  *Id.* at 34.

Eckert also installed multiple cameras that recorded Meadows's property.  *Id.* at 12, 14, 22, 25.  Meadows then discovered that Eckert had posted numerous videos of Meadows on Facebook and YouTube, including videos in which Meadows was only partially clothed.  *Id.* at 22, 30, 31, 33.  In December 2020, Meadows "erect[ed] a pole with a sheet as a partition to prevent Eckert's roof cam[era] from peering into the

---

[10] Meadows also alleges that Buffalo police officers inadequately responded to her complaint about a damaged electrical line near her home.  Docket Item 44 at 17.  It is unclear whether Meadows claims that Eckert was responsible for that damage.

backyard." *Id.* at 26.  Eckert then stole the sheet.  *Id.*  Although the police "did a report for petit larceny," Meadows "was not given a warrant for Eckert's crime."  *Id.*

Meadows's and Eckert's disputes extend beyond their houses.  For example, Eckert "ma[de] numerous complaints to the [United States Department of Veterans Affairs,] alleging [that] Meadows would kill the president."  *Id.* at 13.  Eckert also "tr[ied] to get [Meadows's] nursing license revoked," accused Meadows of food stamp and Social Security fraud, made "false child abuse allegations against Meadows," and called a crisis services emergency phone line in an attempt to have Meadows "involuntarily committed to a psychiatric facility."  *Id.* at 13, 20.  And Eckert "file[d] fraudulent insurance claims against" Meadows's insurance policies.  *Id.* at 29-30.

When Meadows once found a "loose dog" in her yard, she took it to the Buffalo animal shelter.  *Id.* at 28.  Apparently, the dog that Meadows took to the shelter was Eckert's, although Meadows was "unaware" of that.  *Id.* at 29.  Meadows then received "a summons . . . to appear in court for dog theft."  *Id.*

In connection with nearly all these incidents, Meadows called local law enforcement.  But local law enforcement, by and large, refused to press charges that Meadows thought were appropriate.

## **LEGAL PRINCIPLES**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[11]

---

[11] The standard for deciding a Rule 12(c) motion is "the same standard [that applies] to dismissals pursuant to Rule 12(b)(6)."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) (alterations omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556).

## DISCUSSION

I.   **THE ERIE COUNTY DEFENDANTS' MOTIONS TO DISMISS AND ECKERT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

A.   **Claims Against Erie County Prosecutors**

Meadows brings claims against Erie County District Attorney John Flynn, as well as Assistant District Attorneys John Schoemick and Milton Gordon, related to their failure to bring sufficiently severe criminal charges against Eckert.  *See, e.g.*, Docket Item 44 at 28.  Meadows also challenges the Erie County prosecutors' decisions to "press the most insignificant and often untrue charges" against her.  *Id.* at 35.  Both of those sets of allegations fail to state viable claims.[12]

---

[12] Although Meadows generally alleges that "all governmental defendants" violated 42 U.S.C. §§ 1981-1983 and 1985-1986, the ADA, and the FHA, *see* Docket Item 44 at 7, 35, the only factual allegations related to the Erie County prosecutors' conduct involves their charging decisions.  This Court accordingly analyzes those claims below.

### 1.  Official-Capacity Claims

As an initial matter, Meadows brings claims against the Erie County prosecutors in their official capacities.  *Id.* at 6.  "[I]t is well established that New York prosecutors act on behalf of the state, not the county in which they serve, when prosecuting a criminal matter."  *Schnitter v. City of Rochester*, 556 F. App'x 5, 9 n.4 (2d Cir. 2014) (summary order) (citing *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988)).  "Thus, if a district attorney or an assistant district attorney acts as a prosecutor, [he] is an agent of the State, and therefore immune from suit in [his] official capacity."  *D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017) (summary order).  On the other hand, if a suit "centers 'on the administration of the district attorney's office'—that is, on the 'office policy' that the district attorney sets—then the district attorney is 'considered a municipal policymaker,' and the Eleventh Amendment does not immunize him from suit."  *Id.* (quoting *Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993)).

For those reasons, Meadows's official-capacity claims against the Erie County prosecutors that do not relate to any office policy are dismissed without leave to amend because those claims are barred by sovereign immunity.  And Meadows's claims related to an alleged Erie County District Attorney's Office policy are subject to dismissal for the reasons stated below.

### 2.  Claims Related to Eckert's Prosecution

Meadows also alleges that the Erie County prosecutors violated her constitutional rights by declining to investigate Meadows's allegations against Eckert and refusing to charge Eckert with sufficiently severe crimes.  *See, e.g.*, Docket Item 44 at 28.  But any claim related to the prosecutors' alleged failure to investigate is not

viable because Meadows "has no constitutional right to have [another person] criminally investigated." *Baltas v. Rivera*, 2021 WL 3023240, at *1 (D. Conn. July 16, 2021). Meadows likewise has no viable claim related to the prosecutors' failure to adequately charge Eckert because "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). And that is so even when the private citizen is the victim of a crime because "[a] crime victim who sues to force the prosecution of the person who did [her] wrong was injured by that person, not by the failure to prosecute that person." *Brady v. Schneiderman*, 2016 WL 3906737, at *3 (S.D.N.Y. July 13, 2016), *aff'd*, 714 F. App'x 60 (2d Cir. 2018).

Because Meadows has no viable claim related to the failure to investigate or prosecute Eckert, any such claim is dismissed without leave to amend.

### 3. Prosecutorial Immunity

At the end of her amended complaint, Meadows alleges that the Erie County prosecutors violated her rights by "press[ing] the most insignificant and often untrue charges" against her. Docket Item 44 at 35. And in Meadows's response to the Erie County defendants' motions to dismiss, she says that she "would like to add malicious prosecution and prosecutorial misconduct" claims against the Erie County prosecutors challenging their conduct in three state court criminal cases.[13] Docket Item 77 at 1-2.

---

[13] Meadows is warned that a court generally "will not consider [] factual allegations raised for the first time in a brief in opposition to a motion to dismiss." *Harrell v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2019 WL 3817190, at *2 n.3 (S.D.N.Y. Aug. 14, 2019). So Meadows should include any factual allegations in a second amended complaint, not in papers responding to a motion.

Although Meadows may amend her complaint to include those claims, any such claim may well be barred by prosecutorial immunity.

Prosecutors are absolutely immune from suit, and that immunity "appl[ies] with full force" to activities that are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).  Prosecutorial immunity

> encompasses not only [prosecutors'] conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation, including presentation of evidence to a grand jury to initiate a prosecution, activities in deciding not to do so, and conduct of plea bargaining negotiations.

*Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986) (citations omitted); *see also Ogunkoya v. Monaghan*, 913 F.3d 64, 72 (2d Cir. 2019) (explaining that prosecutors have absolute immunity for decisions and acts that "constituted an exercise of their prosecutorial discretion in preparing a case for indictment and deciding when, where, and how to prosecute").  But such immunity does not include "those aspects of the prosecutor's responsibility that cast him in the role of an administrator or investigative officer rather than that of advocate." *Warney v. Monroe County*, 587 F.3d 113, 121 (2d Cir. 2009) (quoting *Imbler*, 424 U.S. at 430-31).  And a prosecutor who "proceeds in the clear absence of all jurisdiction" is not immune from suit.  *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (quoting *Barr v. Abrams,* 810 F.2d 358, 361 (2d Cir. 1987)).

To the extent that Meadows alleges that the Erie County prosecutors violated her constitutional rights by bringing criminal charges against her, those are precisely the sort of claims that are barred by prosecutorial immunity.  *See Giraldo v. Kessler*, 694 F.3d 161, 167 (2d Cir. 2012) (noting that prosecutors are absolutely immune from

claims challenging "legal decisions at the core of the prosecutorial function," including the "pursuit of [] charges").  And even though "racially invidious . . . prosecutions, pursued without probable cause, are reprehensible, [] such motives do not necessarily remove [a prosecutor's] conduct from the protection of absolute immunity."  *See Bernard v. County of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004).  So any claims against any Erie County prosecutor challenging their charging decisions are not viable.

In light of her *pro se* status, Meadows may amend her complaint to state viable claims against the Erie County prosecutors.  *See Cuoco*, 222 F.3d at 112.  But if she does, she must allege facts showing why those claims are not barred by absolute prosecutorial immunity.

### B.   *Monell* Claims

Meadows also brings claims against Erie County related to an alleged policy of failing to prosecute "Black complaints against White[]" individuals while over-prosecuting "when the complainant is White and the accused is Black."[14]  *See* Docket Item 44 at 22. She seeks relief for that unlawful policy under 42 U.S.C. § 1983.  *See id.* at 2.

 "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)).  A municipality cannot be held liable under section 1983 unless the challenged action was undertaken

---

[14] The Court construes Meadows's official-capacity claims against Erie County prosecutors as municipal liability claims for the reasons stated above.

pursuant to a municipal policy or custom.  *See Monell*, 436 U.S. at 694.  To state a claim under *Monell*, a plaintiff must plead three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

As noted above, Meadows has no constitutional right to have her complaints against Eckert investigated by Erie County prosecutors or to have those prosecutors charge Eckert with a crime.  So any *Monell* claim related to those allegations is not viable and is dismissed without leave to amend.  *See Est. of M.D. by DeCosmo v. New York*, 241 F. Supp. 3d 413, 430 (S.D.N.Y. 2017) ("If a plaintiff alleges no constitutional violation, or a district court finds that the plaintiff has inadequately alleged one, the *Monell* claim fails.").[15]

Any claim against Erie County based on Meadows's own prosecution also is not viable.  "*Monell* liability attaches only where an infringement of constitutional rights is caused by a local government policy," not some policy attributable to the state.  *See Bellamy v. City of New York*, 914 F.3d 727, 757 (2d Cir. 2019).  Although "the actions of county prosecutors in New York are generally controlled by municipal policymakers for purposes of *Monell*" liability, *see id.* at 759, the Second Circuit has "consistently held that 'inherently prosecutorial functions (i.e., decisions whether to prosecute) are controlled by state policies for purposes of *Monell*,'" *see Kellner v. City of New York*, 2021 WL 4251343, at *17 (E.D.N.Y. Sept. 17, 2021) (quoting *Bellamy*, 914 F.3d at 758).

---

[15] For that reason, and for the reasons stated below, Meadows has not alleged a viable *Monell* claim based on Singh's conduct.  *See Est. of M.D. by DeCosmo*, 241 F. Supp. 3d at 430.

For that reason, "a prosecutor's decision whether to prosecute an individual may not form the basis for *Monell* liability." *Id.* In other words, a prosecutor's charging decision is attributable to the state, not the county, and therefore cannot provide the basis for a section 1983 claim against a municipality. So Meadows's allegations that the Erie County prosecutors unlawfully charged her by "press[ing] the most insignificant and often untrue charges," *see* Docket Item 44 at 35, do not and cannot state a viable *Monell* claim against Erie County.

Meadows's claims against Erie County therefore are subject to dismissal. Nevertheless, in light of her *pro se* status, *see Cuoco*, 222 F.3d at 112, she may amend her complaint to state a viable claim under *Monell*. But for the reasons stated above, any such claim cannot be based on the Erie County prosecutors' failure to charge Eckert or their decisions to charge Meadows.

## C. Claims Against Singh

Meadows also brings claims against Singh, an employee of the Erie County Department of Health, for his failure to investigate Meadows's complaints about the pipe on Eckert's property. *See* Docket Item 44 at 23. But "there is no constitutional or otherwise enforceable right to an investigation by government officials." *Vazquez v. City of New York*, 2021 WL 1966397, at *9 n.8 (S.D.N.Y. May 17, 2021) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989)); *see also Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." (alterations, citation, and internal quotation marks omitted)). Because Meadows's claims against Singh relate to his purported failure to adequately

17

investigate her complaints, those claims are not viable and are dismissed without leave to amend because any amendment would be "futile."[16]  *See Cuoco*, 222 F.3d at 112.  If Meadows can plead other factual allegations showing that Singh is liable to her under some other theory of liability, she may do so in a second amended complaint.

### D.   Claims Against Eckert

Meadows alleges that Eckert violated her rights under 42 U.S.C. §§ 1981-1983 and 1985-1986, the ADA, and the FHA.  Docket Item 44.  For the reasons that follow, none of those claims are viable as pleaded.

#### 1.   1981 Claim

"To establish a claim under 42 U.S.C. § 1981, a plaintiff must establish the following elements: (1) she is a member of a racial minority; (2) the defendant intended to discriminate against her on the basis of race; and (3) the discrimination concerned 'one of the statute's enumerated activities.'"  *Gatling v. West*, 850 F. App'x 91, 96 (2d Cir. 2021) (summary order) (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000)).  "The enumerated activities include the rights 'to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.'"  *Id.* at 96-97 (quoting 42 U.S.C. § 1981(a)).  "To prevail" on a claim under section 1981, "a plaintiff must initially plead and ultimately prove that, but for race, [she]

---

[16] Because this Court finds that Meadows's claims against Singh are not viable, it does not reach Singh's alternative argument that those claims are barred by *res judicata*.  *See* Docket Item 89.

18

would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).

Although the amended complaint does not identify the protected right that Eckert allegedly deprived Meadows of, Meadows seems to rely on section 1981's "full and equal benefit" clause. *See* Docket Item 85 at 3 (suggesting that Eckert violated "Stephanie's Law, The Backyard Camera Bill[,] and Penal Code [sections] 250.00 and 250.05").[17] "Few cases in this circuit or elsewhere arise under the 'equal benefit' clause of [section] 1981." *Benzinger v. NYSARC, Inc. N.Y.C. Chapter*, 385 F. Supp. 3d 224, 235 (S.D.N.Y. 2019) (quoting *Pierre v. J.C. Penney Co.*, 340 F. Supp. 2d 308, 310 (E.D.N.Y. 2004)). "To establish a violation of [section] 1981's guarantee of 'full and equal benefit' of laws, a plaintiff must '[(1)] allege racial animus; [(2)] identify a relevant law or proceeding for the security of persons and property; and [(3)] allege that [the] defendants deprived [her] of the full and equal benefit thereof.'" *Id.* (alterations and internal quotation marks omitted) (quoting *Bishop v. Toys "R" Us-NY LLC*, 414 F. Supp. 2d 385, 393 (S.D.N.Y. 2006)).

Even if this Court very liberally reads the allegations in Meadows's response to the motion for judgment on the pleadings, *see supra* at 13 n.13, Meadows does not say how Eckert deprived her of her rights under those laws, nor does she say how her race was a but-for cause of that deprivation. And without those allegations, Meadows's section 1981 claim is not viable. *See Williams v. Calderoni*, 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012) (dismissing section 1981 claim because a conclusory allegation

---

[17] Sections 250.00 and 250.05 of the New York Penal Law prohibit unauthorized eavesdropping. *See* N.Y. Penal Law §§ 250.00, 250.05.

that a challenged action was taken because of race, "without a fact-specific allegation of a causal link between [the] defendant's conduct and the plaintiff's race[,] is too conclusory to survive a motion to dismiss"), *aff'd*, 529 F. App'x 89 (2d Cir. 2013). Although Meadows's claim under section 1981 therefore is not viable as currently pleaded, she may amend her complaint to state a viable section 1981 claim.

### 2.    1983 Claims

Meadows also brings claims against Eckert under 42 U.S.C. § 1983 and asserts that Eckert violated her Fourth and Fourteenth Amendment rights.  Docket Item 44.  But Meadows has not sufficiently alleged that Eckert is a state actor subject to liability under 42 U.S.C. § 1983, and her claims therefore are subject to dismissal.

Generally, the "United States Constitution regulates only the [g]overnment, not private parties."  *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 263 (2d Cir. 2014); *see also Phillips v. Sage Colls.*, 83 F. App'x 340, 341 (2d Cir. 2003) (summary order) ("With the exception of the Thirteenth Amendment prohibition against slavery, the United States Constitution regulates only government action, not that of private parties.").  So when a plaintiff "alleges that her constitutional rights have been violated," she "must first establish that the challenged conduct constitutes state action." *Grogan*, 768 F.3d at 263 (citation and internal quotation marks omitted).

The Second Circuit has "identified three main tests to determine" whether an otherwise private entity has engaged in state action:

> "(1) when the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); and (3) when the entity has been delegated a public function by the state ('the public function test')."

20

*Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022) (alterations omitted) (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)).  "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state."  *Fabrikant*, 691 F.3d at 207 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

The only allegations in the amended complaint that might possibly bear on whether Eckert was a state actor relate to Eckert's calling law enforcement on Meadows.[18]  In other words, Meadows may be alleging that Eckert is liable under section 1983 because she has invoked the assistance of law enforcement on numerous occasions.  But a "call to the police does not amount to 'willful collaboration' giving rise to [section] 1983 liability."  *Johns v. Home Depot U.S.A., Inc.*, 221 F.R.D. 400, 405 (S.D.N.Y. 2004) (collecting cases).  Nor does a private individual's invocation of legal process necessarily transform her into a state actor.  *See Vazquez v. Combs*, 2004 WL 2404224, at *4 (S.D.N.Y. Oct. 22, 2004) ("[M]erely filing a complaint with the police, reporting a crime, requesting criminal investigation of a person, or seeking a restraining order, even if the complaint or report is deliberately false, does not give rise to a claim against the complainant for a civil rights violation.").  And that is true even if Eckert allegedly "supplied the police with false information."  *See Johns*, 221 F.R.D. at 405.

---

[18] While Meadows suggests in her response to Eckert's motion for judgment on the pleadings that Eckert was a state actor because she "unlawfully surveill[ed]" Meadows using the house-mounted video cameras and provided that video to law enforcement, Docket Item 85 at 3, nothing in the amended complaint indicates that law enforcement encouraged Eckert to do this.  Likewise, Meadows's conclusory assertion in her response that local law enforcement "deputized" Eckert into some governmental role, *see id.*, finds no support in the amended complaint.

Finally, Meadows has not alleged any sort of "plan, prearrangement, conspiracy, custom, or policy" shared by Eckert and any state actor.  *See Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999).  Instead, Meadows alleges throughout the amended complaint that local law enforcement simply reacted to whatever true or false information Eckert provided, not that they directed her to do anything or conspired with her.  And that is not enough to raise a viable claim.

Because there is no plausible basis in the amended complaint to find that Eckert was a state actor, Meadows's claims against her under section 1983 are not viable. Nevertheless, and again in light of her *pro se* status, *see Cuoco*, 222 F.3d at 112, Meadows may amend her complaint to allege how Eckert was a state actor who violated Meadows's constitutional rights and therefore is subject to liability under section 1983.

### 3.    1985 and 1986 Claims

Meadows also asserts claims against Eckert under 42 U.S.C. §§ 1985 and 1986. Docket Item 44 at 2.  To bring a claim under section 1985, a plaintiff must allege

> 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006).  "A section 1985(3) conspiracy must also be motivated by some racial or [] otherwise class-based, invidious discriminatory animus behind the conspirators' action."  *Id.* (citation and internal quotation marks omitted).  A claim under section 1986, which "imposes liability on an individual who has knowledge of discrimination prohibited under [section] 1985," is

"contingent on a valid [section] 1985 claim."  *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996).

The amended complaint details a series of encounters when Eckert or Meadows called the police and the police responded to the scene.  The amended complaint further alleges that Meadows spoke with Erie County prosecutors who inadequately handled her complaints about Eckert.  But nothing in those allegations suggests that Eckert conspired with law enforcement, county prosecutors, or anyone else to deprive Meadows of any protected right.

Because Meadows has not alleged that Eckert conspired with anyone, her claims under section 1985 and 1986 are not viable.  But in light of her *pro se* status, *see Cuoco*, 222 F.3d at 112, Meadows may amend her complaint to state viable claims under those sections.

### 4.  ADA Claim

Meadows also alleges that Eckert violated Meadows's rights under the ADA. Docket Item 44 at 2.  The basis of Meadows's ADA claim against Eckert is not entirely clear, although Meadows may be alleging that Eckert violated the ADA when she assaulted Meadows with a skillet.  *See id.* at 15 (alleging that Eckert struck Meadows while "ha[ving] full, prior knowledge that Meadows is disabled").  Troubling as that sort of private violence may be, it does not give rise to a viable ADA claim.  *See generally Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004) ("[The ADA] forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III."); *see*

generally *Wilshire v. L&M Dev. Partners*, 2022 WL 847067, at *3 (S.D.N.Y. Mar. 22, 2022) ("To prevail on a claim under the ADA, a plaintiff must establish, among other things, that [the] defendants are subject to one of the titles of the ADA.").  Although Meadows's ADA claim does not appear to be viable in any form, the Court nevertheless grants her leave to amend this claim to show how Eckert violated her rights under the ADA.

### 5.    FHA Claim

Meadows also alleges that Eckert violated the Fair Housing Act.[19]  Docket Item 44 at 35.  Section 3617 of the Fair Housing Act "provides that 'it shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of [her] having exercised or enjoyed, or on account of [her] having aided and or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.'"  *Birch Fam. Servs.*, 2021 WL 2312852, at *5 (alterations omitted) (quoting 42 U.S.C. § 3617).[20]  "To prevail

---

[19] Meadows does not say which section of the FHA that Eckert purportedly violated, but other courts have applied section 3617 to similar neighbor-on-neighbor disputes.  *See, e.g.*, *Birch Family Servs., Inc. v. Wlody*, 2021 WL 2312852, at *5 (E.D.N.Y. June 7, 2021), *aff'd*, 2022 WL 1468160 (2d Cir. May 10, 2022).  So at this stage, the Court declines to grant Eckert's motion for judgment on the pleadings simply because Eckert "is not [Meadows's] landlord."  *See* Docket Item 78-1 at 4.

[20] Although section 3617 refers specifically to other sections of the FHA, courts "within and outside of the Second Circuit have held that [section] 3617 can serve as a separate and independent basis for an FHA claim" challenging conduct that occurred after the sale or lease of a dwelling "even if there is no predicate for liability" under the other sections referenced in section 3617.  *Birch Family Servs.*, 2021 WL 2312852, at *6; *see also Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 88 (2d Cir. 2021) (Lohier, J., dissenting in part and concurring in part) ("[T]he plain language of [section] 3617 creates a separate cause of action that more comprehensively prohibits post-acquisition discriminatory conduct barred by [section] 3604(b)."); *but see id.* at 80 n.50 (majority opinion leaving open the extent to which "the FHA's prohibition of discrimination

on a [section] 3617 claim, a plaintiff must show that: (1) she is a member of a protected class under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) [the] defendants were motivated in part by an intent to discriminate, and (4) [the] defendants coerced, threatened, intimidated[,] or interfered with [the] plaintiff on account of her protected activity under the FHA." *Id.* (alterations, citation, and internal quotation marks omitted); *see also Watters v. Homeowners' Ass'n at Pres. at Bridgewater*, 48 F.4th 779, 785 (7th Cir. 2022) (same).

Not "every quarrel among neighbors" gives rise to a viable FHA claim. *See Halprin v. Prairie Single Fam. Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004). "After all, isolated acts of racial animus are not enough; there must be some nexus between a stray remark and the challenged action." *Watters*, 48 F.4th at 786 (alterations, citation, and internal quotation marks omitted). In other words, "even the worst behavior toward one's neighbors requires some nexus to an adverse housing action; otherwise, the claim is not actionable under the FHA." *Id.* at 791 (St. Eve, J., dissenting in part).

Meadows has not alleged such a nexus between any racial animus and an adverse housing action here. Instead, Meadows alleges that sometime after the first dispute over the pipe, Eckert posted on social media that "the dispute was because Eckert 'was white' and [because] Meadows 'doesn't like white women.'" Docket Item 44 at 10. It is unclear how those statements had an effect on any challenged housing

---

reaches conduct engaged in after a tenant acquires [a] dwelling"). This Court therefore assumes without deciding that Meadows's claims against Eckert, which all relate to conduct that occurred after Meadows moved into her home and do not arise out of any real estate transaction, relate to the sort of conduct that is protected under section 3617 of the FHA.

action; in fact, after Eckert made those statements, the pipe issue appeared to have

been voluntarily resolved.  *See id.* at 11 ("Eckert had the pipe fixed one week later.").

Moreover, Meadows does not otherwise tie those "stray remark[s]" to any other

challenged action.  *See Watters*, 48 F.4th at 786.  Instead, the remainder of Meadows's

amended complaint is devoted to the sort of neighborhood quarrels that do not give rise

to a viable FHA claim.  *See Halprin*, 388 F.3d at 330.  So there does not appear to be

any connection between race and any issue under the FHA.

For those reasons, Meadows has not raised a viable FHA claim.  Nevertheless,

and again in light of her *pro se* status, *see Cuoco*, 222 F.3d at 112, Meadows may

amend her complaint to allege how Eckert violated her fair housing rights and how that

violation was connected to racial animus.

### 6.     1982 Claim

Section 1982 provides that "[a]ll citizens of the United States shall have the same

right, in every State and Territory, as is enjoyed by white citizens thereof to inherit,

purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982.

"To prevail on a section 1982 claim, [a] plaintiff[] must show that (1) [she is a] member[]

of a racial minority; (2) the defendant intended to discriminate against [her] on the basis

of race; and (3) the discrimination involved one or more activities enumerated in the

statute."  *Okudinani v. Rose*, 779 F. App'x 768, 771 (2d Cir. 2019) (summary order).  So

"[a] plaintiff states a viable cause of action under [section] 1982 only by alleging a

deprivation of [her] rights on account of [her] race, ancestry, or ethnic characteristics."

*Zemsky v. City of New York*, 821 F.2d 148, 150 (2d Cir. 1987); *see also Comcast*, 140

S. Ct. at 1016 ("[The Supreme Court] has repeatedly held that a claim arises under

[section] 1982 when a citizen is not allowed to acquire property *because of* color." (emphasis in original) (alterations, citation, and internal quotation marks omitted)).

As mentioned above, the only factual allegations in Meadows's amended complaint that could show that Eckert acted with racial animus are Eckert's social media posts.  But Meadows alleges that those posts were made *after* the pipe incident that spurred Meadows's and Eckert's dispute, and Meadows does not otherwise tie those posts to Eckert's subsequent conduct or provide any further link between racial animus and Meadows's ability to "purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982.  So Meadows has not sufficiently alleged a link between any challenged conduct and alleged racial animus.[21]  *See Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 296 (S.D.N.Y. 2011) ("[F]act-specific allegations of a causal link between the defendant's actions and the plaintiff's race are required" for a claim under section 1982, "and conclusory or naked allegations will not suffice." (alterations, citation, and internal quotation marks omitted)).  Nevertheless, and again in light of her *pro se* status, *see Cuoco*, 222 F.3d at 112, Meadows may amend her complaint to state a viable claim under section 1982.

---

[21] Eckert asserts that Meadows's section 1982 claim is not viable because "[Meadows] has not alleged that [] Eckert in any way interfered with [Meadows's] ability to inherit, purchase, lease, sell, hold, and convey real and personal property."  Docket Item 78-1 at 4 (citation and internal quotation marks omitted).  Because this Court concludes that Meadows's section 1982 claim is subject to dismissal for the reasons stated above, it does not reach whether any of the conduct alleged in the amended complaint is the sort that would interfere with Meadows's "freedom to hold property, a right protected by section 1982."  *Okudinani*, 779 F. App'x at 772; *see also id.* (noting that other courts have considered section 1982 claims involving the "detonat[ion of] a flash simulator near the plaintiff's vehicle while she was driving; throwing a Molotov cocktail onto the plaintiffs' porch; and burning a cross on the plaintiffs' lawn").

### E.    Leave to Amend

As repeatedly noted above, because Meadows is proceeding *pro se* and therefore is entitled to heightened deference, she is granted leave to amend her complaint.  *See Shibeshi v. City Univ. of N.Y.*, 531 F. App'x 135, 136 (2d Cir. 2013) (summary order) ("[D]istrict courts should generally not dismiss a *pro se* complaint without granting the plaintiff leave to amend.").  But Meadows's claims related to Eckert's non-prosecution, her *Monell* claims against Erie County challenging prosecutorial charging decisions and Singh's failure to investigate, and her claims against Singh related to his failure to investigate are dismissed without leave to amend because any amendment would be "futile."  *See Cuoco*, 222 F.3d at 112.

Meadows is advised that an amended complaint is intended to completely replace the prior complaint and thus "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977).  Meadows also is advised that she must follow the Federal Rules of Civil Procedure if she seeks to amend her complaint again and cannot continue to file "supplemental pleadings" that do not comply with those rules.  Supplemental filings that do not comply with the Federal Rules of Civil Procedure or this Court's orders will not be considered.  Meadows therefore should include any allegations that she wants the Court to consider in a second amended complaint.

## II.    MEADOWS'S REMAINING MOTIONS

### A.    Voluntary Dismissal

On September 29, 2022, Meadows filed an "amended claim w[ith] supplemental pleadings."  Docket Item 125.  In that filing, Meadows said that she "wish[ed] to

withdraw the following 'lesser actors' of the [Buffalo Police Department] from this claim": Officer Dixon, Officer Otwell, Officer Salazar, Officer Casey, Officer Reed, Officer Antonio, Officer George, Lieutenant Harrison, Officer Brown, Officer Rachuna, Officer Keenan, Officer Cullen, Officer Hayden, Officer Creahan, John Flynn, Lieutenant Danner, Officer Maryanski, Officer Santiago, Officer Domoros, Officer Raye, Officer Kline, and Officer Nowak. *Id.*

Most of those defendants have not answered the complaint, moved for summary judgment, or even appeared in this case. So Meadows may voluntarily dismiss her claims against them under Federal Rule of Civil Procedure 41(a). *See* Fed. R. Civ. P. 41(a)(1)(A)(i); *see also Frank v. Trilegiant Corp.*, 2012 WL 214100, at *3 (E.D.N.Y. Jan. 24, 2012) (noting that "district courts within the Second Circuit have [] adopted the approach of the majority of courts in other circuits—that is, that Rule 41(a) does not require dismissal of the action in its entirety"). Based on Meadows's representation that she wishes to "remov[e] [those defendants] from liability," Docket Item 125, the Court interprets Meadows's filing as a notice of voluntary dismissal under Federal Rule of Civil Procedure 41(a)(1)(A) and dismisses all claims against all defendants listed above except John Flynn.

Because Flynn may have been erroneously included in that list—the list otherwise includes only police officers and does not include any other Erie County prosecutor—Meadows may inform this Court whether she intends to pursue her claims against him within 45 days of the date of this order. *See Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (noting the "obligation on the part of the court to make reasonable

allowances to protect *pro se* litigants from inadvertent forfeiture of important rights").
That filing may be made at the same time any second amended complaint is filed.

### B.   Motion to Strike

On August 4, 2022, Meadows filed another "amended claim."  Docket Item 111.
Eckert and the Erie County defendants objected to and rejected that filing, arguing that
it did not comply with the Federal Rules of Civil Procedure.  Docket Item 111, 114.
Meadows has moved to strike the Erie County defendants' objection, Docket Item 120,
apparently on the grounds that this Court gave her leave to amend her complaint when
the Court "respon[ded]" to one of Meadows's filings asking this Court to enter a default
against certain defendants who had not been served.  *See* Docket Items 110, 120.

On August 8, 2022, this Court denied Meadows's request that this Court direct
the Clerk of the Court to enter a default.  *Id.*  In that order, this Court also extended the
time for Meadows to serve the remaining defendants who had not yet been served.
*See id.*  That order said nothing about granting Meadows leave to amend her complaint.
So while Meadows says that she believed that this Court granted her leave to amend
when it "respon[ded]" to one of her filings, Meadows's filing was not a motion to amend
and this Court never granted leave to amend.[22]

---

[22] What is more, Meadows filed her amended claim *before* this Court issued the
order that she claims authorized that supplemental pleading.  *Compare* Docket Item 111
(Meadows's amended claim filed on August 4, 2022), *with* Docket Item 112 (this Court's
order filed on August 8, 2022).  So Meadows could not have plausibly relied on that
order in filing her amended claim.  Although Meadows is proceeding *pro se* and her
submissions "must be construed liberally," *see Triestman v. Fed. Bureau of Prisons*,
470 F.3d 471, 474 (2d Cir. 2006), that latitude is not boundless.

For those reasons, Meadows's motion to strike is denied.  And this Court again advises Meadows that her failure to comply with the Federal Rules of Civil Procedure or this Court's orders may result in this Court's not considering her filings.  *See Roberts v. Blowers*, 2022 WL 10068263, at *3 (W.D.N.Y. Oct. 17, 2022) ("[*Pro se*] litigants have an obligation to comply with a court's orders, and when they fail to do so, they, like all litigants, must suffer the consequences of their actions." (citation and internal quotation marks omitted)); *Wilson v. Gantert*, 2004 WL 1591400, at *2 (W.D.N.Y. July 12, 2004) ("[E]ven *pro se* litigants must abide by the Federal Rules of Civil Procedure." (italicization added)).

### C.  Motion for a Preliminary Hearing

Finally, Meadows's motion for a preliminary hearing, Docket Item 119, is denied. No hearing was necessary to decide these motions.  *See Whitnum v. Town of Woodbridge*, 833 F. App'x 924, 925 (2d Cir. 2021) (summary order) ("[A] district court's decision whether to permit oral argument rests within its discretion.").  As stated above, Meadows may file a second amended complaint within 45 days of the date of this order, and Eckert and the Erie County defendants may answer, move against, or otherwise respond to the second amended complaint within 30 days of its filing.  If oral argument is necessary to decide any motions made in response to a second amended complaint, this Court will schedule it at a later time.

### III.  SERVICE ON THE REMAINING DEFENDANTS

Although Meadows has voluntarily dismissed her claims against several defendants, she still has not effected service on several others.  This Court previously extended Meadows's time to effect service and advised her that if she could not effect

service within 90 days of the date of that order, she should request an extension of time to do so.  *See* Docket Item 112.  On September 27, 2022, Meadows filed an affidavit of service asserting that the "City of Bflo, BPD, et al [sic]" were served with the summons and complaint.  Docket Item 121.  But the Buffalo Police Department and the City of Buffalo already had appeared and answered the amended complaint, *see* Docket Item 118, and this Court has no idea to which of the remaining defendants "et al" refers.  So the City of Buffalo and the Buffalo Police Department need not be served again, and this Court has no way of knowing whether Meadows has served any of the remaining defendants who had not been served already.

Meadows's time to effect service is extended another 90 days from the date of this order.  The Court reminds Meadows that while she may rely on the United States Marshals Service to effect service, *see* Fed. R. Civ. P. 4(c)(3), she must inquire of the Marshals at 716-348-5300 as to whether service has been made and, if necessary, request an extension of time to effect service.  *See Meilleur v. Strong*, 682 F.3d 56, 63 (2d Cir. 2012).  If Meadows has not effected service within 90 days of the date of this order or requested an extension of time to do so, this Court may order her to show cause why her claims against the unserved defendants should not be dismissed for failure to effect service.

## CONCLUSION

For the reasons stated above, the Erie County defendants' motions to dismiss, Docket Items 54, 56, 58, 60, and 62, are GRANTED in part.  Meadows's claims related to Eckert's non-prosecution, her *Monell* claims against Erie County challenging prosecutorial charging decisions and Singh's failure to investigate, and her claims

against Singh related to his failure to investigate are dismissed without leave to amend. And the remainder of the Erie County defendants' motions to dismiss, as well as Eckert's motion for judgment on the pleadings, Docket Item 78, will be granted unless Meadows files an amended complaint correcting the deficiencies noted above within 45 days of the date of this order.  Eckert and the Erie County defendants may renew their motions or otherwise respond to any amended complaint within 30 days of its filing.  If Meadows does not file an amended complaint within 45 days of the date of this order, then her claims against Eckert and the Erie County defendants will be dismissed and the Clerk of the Court shall terminate Eckert, Schoemick, Flynn, Gordon, Erie County, and Singh as defendants in this case.

Meadows's motions to strike, Docket Items 87 and 120, are DENIED. Meadows's motions to amend, Docket Items 93 and 109, are DENIED as moot, and Meadows's motion for a preliminary hearing, Docket Item 119, is DENIED without prejudice.  Meadows's motion to withdraw certain defendants, Docket Item 125, is GRANTED.  The Clerk of the Court shall terminate the following defendants from this case:  Officer Dixon, Officer Otwell, Officer Salazar, Officer Casey, Officer Reed, Officer Antonio, Officer George, Lt. Harrison, Officer Brown, Officer Rachuna, Officer Keenan, Officer Cullen, Officer Hayden, Officer Creahan, Lt. Danner, Officer Maryanski, Officer Santiago, Officer Domoros, Officer Raye, Officer Kline, and Officer Nowak.  Meadows may inform this Court within 45 days of the date of this order if she also wishes to withdraw her claims against John Flynn.  Meadows's time to effect service on the unserved defendants is extended another 90 days from the date of this order.

SO ORDERED.

Dated:   January 30, 2023
         Buffalo, New York


_/s/ Lawrence J. Vilardo_
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE