UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

CAROLETTE MEADOWS,

            Plaintiff,

     v.

BUFFALO POLICE DEPARTMENT, *et al.*,

            Defendants.

_____

                          21-CV-449-LJV-HKS
                          DECISION & ORDER

      On March 29, 2021, the *pro se* plaintiff, Carolette Meadows, commenced this action under 42 U.S.C. §§ 1981-1983 and 1985-1986 and the Americans with Disabilities Act ("ADA").  Docket Item 1.  Meadows, who has amended her complaint twice to include additional allegations and causes of action, says that her neighbor, Rachel Eckert, repeatedly violated her rights under federal law over the course of a long-running feud between them.  *See* Docket Item 44 (amended complaint); Docket Item 134 (second amended complaint).  Meadows also says that local law enforcement and county prosecutors inadequately responded to her complaints while giving undue weight to Eckert's grievances.  Docket Item 134 at 2-4.[1]

      After Meadows filed the first amended complaint, several of the defendants—Erie County, Erie County District Attorney John Flynn, Erie County Assistant District Attorneys John Schoemick and Milton Gordon, and Erie County Department of Health employee Ankur Singh—moved to dismiss the complaint, Docket Items 54, 56, 58, 60,

_____

     [1] Page numbers for docket citations refer to ECF pagination.

and 62.  In addition, Eckert moved for judgment on the pleadings, Docket Item 78.[2]  On January 30, 2023, this Court ruled on those motions, dismissing some claims and stating that the remaining claims against Eckert, Erie County, Flynn, Schoemick, Gordon, and Singh would be dismissed unless Meadows filed a second amended complaint correcting the deficiencies identified in its decision and order.  Docket Item 127 at 2-3.

On March 31, 2023, Meadows asked this Court to reconsider its dismissal of some of her claims against Flynn, Schoemick, and Gordon ("the Erie County prosecutors").[3]  Docket Item 133 at 2; *see also* Docket Item 127 at 12-17.  On the same day, she filed a second amended complaint against a number of defendants, including Eckert, Erie County, and the Erie County prosecutors.[4]  Docket Item 134.  That

---

[2] After those motions were filed, this Court referred this case to United States Magistrate Judge H. Kenneth Schroeder, Jr., for all proceedings under 28 U.S.C. § 636(b)(1)(A) and (B).  Docket Item 80.

[3] Meadows refers to the Court's "decision to dismiss [her] claim[s] against the [District Attorneys] and/or the [District Attorney's] office."  Docket Item 133.  Based on Meadows's allegations in this action and the claims dismissed in the Court's previous order, Docket Item 127, the Court assumes she means to refer to her claims against the three prosecutors—a district attorney and two assistant district attorneys.

[4] Meadows also sued the City of Buffalo, the Buffalo Police Department ("BPD"), a BPD deputy commissioner, a BPD detective, several BPD lieutenants and officers, a number of John and Jane Doe defendants sued as members of the BPD, and City of Buffalo Inspector Frank Bifaro.  Docket Item 134.  Those defendants answered the second amended complaint.  Docket Item 135 and 167.  So this case will continue against all of the answering defendants but one: Officer Nowak, who answered the complaint, Docket Item 167, before Meadows pointed out that her claims against him had already been dismissed in the Court's previous order, *see* Docket Item 127 at 29 (dismissing Nowak); Docket Item 168 at 2 (statement from Meadows that Nowak had already been dismissed from this action); Docket Item 169 (Judge Schroeder's order instructing the Clerk of the Court to terminate Nowak).

Meadows did not amend her claims against Singh, *see* Docket Item 134, and the Clerk of the Court therefore terminated him as a party to this action, *see* Docket Item

complaint asserted claims under 42 U.S.C. §§ 1981-1983 and 1985-86, the ADA, the Civil Rights Act, and the Fair Housing Act ("FHA").[5]  Docket Item 134 at 3.

Erie County and the Erie County prosecutors ("the Erie County defendants") responded to Meadows's motion for reconsideration, Docket Items 136 and 137; they also moved to dismiss the second amended complaint and to strike that complaint, or, in the alternative, to strike certain allegations made in it, *see* Docket Items 141-43. Around the same time, Eckert also moved to dismiss the second amended complaint. Docket Item 139.

Meadows responded to both motions to dismiss in a single filing, Docket Item 145, and both the Erie County defendants and Eckert replied, Docket Item 146 (Erie

---

127 at 33 (stating that "[i]f Meadows d[id] not file an amended complaint within 45 days of the date of th[at] order, then her claims against Eckert and [several defendants including Singh] w[ould] be dismissed").

[5] Meadows also refers to New York State law in her second amended complaint, *see, e.g.*, Docket Item 134 at 69, 89 (referring to New York statutes protecting rights of crime victims and right of access to government proceedings in asserting claims against the Erie County prosecutors).  She also asserts claims against all defendants for "[i]ntentional infliction of emotional dist[re]ss," *id.* at 50, and for "[c]onspiracy to [c]ommit [b]attery," *id.* at 91 (bolding and underlining omitted).

It is not entirely clear, however, that Meadows intends to bring any state law claims here, at least against Eckert.  In fact, in briefing the motions on her first amended complaint, she specifically stated that "[t]here is nothing in [her first amended complaint] that is [a] tort [claim]."  Docket Item 85 at 4.  There is good reason for this.  In May 2021, Meadows brought a tort action in New York State Supreme Court, Erie County, against Eckert, the City of Buffalo, and several other defendants not named in this action based on many of the same factual allegations raised here.  *See Meadows v. Eckert*, Case No. 806407, Docket Item 1 (N.Y. Sup. Ct. Erie Cnty. May 14, 2021); *id.*, Docket Item 7 (N.Y. Sup. Ct. Erie Cnty. Jan. 13, 2022) (amended complaint).  On June 15, 2022, New York Supreme Court Justice Dennis E. Ward dismissed all of Meadows's claims.  *Id.*, Docket Item 120 (N.Y. Sup. Ct. Erie Cnty. Jun. 15, 2022).  So the Court does not construe the complaint as raising any state law claims against Eckert here.  And the claims against the Erie County prosecutors—regardless of whether those claims are rooted in state or federal law—are not viable for the reasons explained below.

County defendants' reply); Docket Item 147 (Eckert's reply).[6]  Meadows then moved for

leave to file supplemental pleading against Flynn, Erie County, the Erie County District

Attorney's Office, and the New York State Attorney General, Docket Item 151, and the

Erie County defendants opposed this request, Docket Item 152.  Without waiting for the

Court to rule on her motion,[7] Meadows then filed her supplemental pleading, Docket

Item 155; the Erie County defendants moved to strike that pleading, Docket Items 156-

58; and the parties briefed the motion to strike,[8] Docket Items 161 (Meadows's

response); Docket Items 162-163 (Erie County defendants' reply).

　　　For the reasons that follow, the Court denies Meadows's motion for

reconsideration, Docket Item 133; grants the motions to dismiss filed by Eckert and the

Erie County defendants, Docket Items 139 and 141; denies Meadows's motion for leave

---

[6] Meadows subsequently moved to strike the replies for failing to comply with "federal procedure."  Docket Item 148.  She argues that "Erie County had [no] right to file a[] response after [Meadows's] sur-reply."  *Id.* at 2.  The Erie County defendants opposed that motion.  Docket Item 149.

Although Meadows attributes both Docket Items 146 and 147 to the Erie County defendants, *see* Docket Item 148 at 3, the second was filed by Eckert.  And because the defendants were replying to Meadows's response to their motions to dismiss—not "respon[ding] to Meadows's "sur-reply," *id.* at 2—the Court denies Meadows's motion to strike, *see* Docket Item 141 (stating that the Erie County defendants intended to submit reply papers on their motion); Docket Items 140 and 144 (setting briefing schedules on defendants' motions); *see* Loc. R. Civ. P. 7(b)(1) (stating that "[a]fter a motion is filed, the Court may issue an order setting deadlines for filing and service of opposing papers, and for filing and service of reply papers if the moving party has stated an intent to reply").

[7] Under Federal Rule of Civil Procedure 15(d), a party may "serve a supplemental pleading" based on conduct that happened after the previous pleading only "[o]n motion and reasonable notice" and with the Court's permission.

[8] In addition, Eckert submitted a letter stating that Meadows's supplemental pleading was "unauthorized" and improper.  Docket Item 160.

to file supplemental pleading, Docket Item 151; and denies as moot the Erie County defendants' motions to strike Meadows's amended complaint, Docket Item 141, and her supplemental pleading, Docket Item 156.[9]

## BACKGROUND[10]

Fences are said to make good neighbors.  *See* Robert Frost, "Mending Wall," in *North of Boston* (1914).  If this action is any indication, pipes make very bad ones.

In the spring of 2020, Eckert "install[ed] piping on her home that blocked Meadows," her next-door neighbor, "from removing her car from the driveway."  Docket Item 134 at 8.  The ensuing feud has now spawned several law enforcement investigations, multiple state court cases, and two lawsuits in this Court.[11]  At issue in this case are several incidents in which Meadows and Eckert had a dispute or altercation—to which police and county prosecutors responded, Meadows says, by

---

[9] The Court also denies Meadows's motion to amend her claim and for service of process by the United States Marshals Service, Docket Item 165, which seems to have been filed mistakenly on this docket.  The Clerk of the Court has re-filed the motion in the correct case, another lawsuit brought by Meadows currently pending before this Court.  *See Meadows v. Erie Cnty. Dep't of Soc. Servs.*, Case No. 23-cv-920, Docket Item 4 (W.D.N.Y. Feb. 8, 2024).  The denial of the motion here is without prejudice to its disposition in that case.

[10] In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "accept[s] all factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).  The following facts are taken from the second amended complaint, Docket Item 134.

[11] Eckert has filed her own lawsuit in this Court, raising claims against Meadows and various other state and municipal defendants similar to those raised here.  *See Eckert v. City of Buffalo*, Case No. 22-cv-540 (W.D.N.Y. 2022).

giving short shrift to Meadows's claims and undue weight to Eckert's.[12]  *See* Docket Items 44 and 134; *see also* Docket Item 127 at 3-10 (summarizing facts alleged in amended complaint).  What follows is the story as Meadows tells it.  *See supra* at 5 n.10.

## I.    THE INITIAL PIPE DISPUTE

Although the pipe that Eckert installed prevented Meadows from using Meadows's own driveway, Eckert refused to move it.  Docket Item 134 at 8-9.  So Meadows "cut the pipe and le[ft]," and Eckert called 911, falsely reporting that Meadows was "threatening" her.  *Id.* at 9.  BPD officers responded to the scene and ultimately "filed a warrant for Meadows [which stated] that the pipe was cut without cause."  *Id.*

Around that same time, Meadows "washed and hung a tent out to dry which was destroyed when she woke up the next morning."  *Id.* at 10.  Meadows asked Eckert whether "she knew anything about the tent"; in response, Eckert "threatened to hit Meadows in the head with a pipe."  *Id.*  Meadows called the police, but the responding

---

[12] Meadows's first amended complaint detailed those various incidents and alleged that the defendants violated her rights under 42 U.S.C. §§ 1981-1983 and 1985-1986, the ADA, and the FHA.  *See* Docket Item 44; Docket Item 127 at 1, 3-4 (summarizing amended complaint).  As noted above, the Court previously dismissed several of her claims and found that other claims were subject to dismissal unless Meadows amended her complaint to correct the identified deficiencies.  *See generally* Docket Item 127.

Meadows's second amended complaint reasserts nearly all of the allegations made in her first amended complaint.  *See* Docket Item 44 at 1-34; Docket Item 134 at 1-39; *see also* Docket Item 143 at 3 (statement of Erie County defendants that "[e]ssentially what [Meadows] has done is copy—with very few revisions—her [a]mended [c]omplaint, and then tack[] on sixty-seven more pages" (internal quotation marks omitted)).  The second amended complaint then adds nearly eighty pages of material, although some of what is added concerns legal or policy arguments, not factual allegations.  *See* Docket Item 134 at 40-119.

officer "declined to file a report." *Id.* After Eckert repeated similar threats on Facebook that night, Meadows again called the police. *Id.* That time, an officer "wrote a complaint for harassment against Eckert for the threats," although another officer later changed that complaint to "a dispute form." *Id.*

Eckert then "remove[d] Meadows'[s] gate," which a Buffalo police officer "made her put back." *Id.* Eckert also claimed that much of Meadows's property belonged to her, "threaten[ed] Meadows numerous times," and "push[ed] [Meadows]." *Id.* Although Meadows tried to show a video of the incident to a Buffalo police officer, he "declar[ed] that he wasn't looking at any videos." *Id.* at 11. No charges were filed against Eckert based on this incident. *Id.*

Eckert then took to social media, where she "ma[de] several racially charged statements . . . claiming the dispute was because Eckert 'was white' and . . . Meadows 'doesn't like white women.'" *Id.* Eckert "declar[ed] . . . 'war'" on Meadows, saying that "she 'would not stop,' and would[] 'destroy [Meadows's] whole life.'" *Id.* Eckert made other "social media posts" that "attack[ed] Meadows['s] disability status and question[ed] her medical history." *Id.* at 13. Other people "respond[ed] to Eckert's racially charged comments by saying that Meadows should be spit on, shot, beat with a bat, and [have] other violence inflicted upon her." *Id.* at 11.

Meanwhile, the dispute over the pipe remained unresolved. Buffalo city employees "asked Meadows to let Eckert reconnect the pipe so it would[] [not] cause [carbon monoxide]" emissions. *Id.* at 12. Eckert also "posted on social media that she took her kids to the [emergency room] and they tested positive for [carbon monoxide]" and that she therefore "wanted Meadows arre[sted] for attempted murder." *Id.* But

Eckert was to blame because she had not "repair[ed] the cut pipe that was supposed to be a [carbon monoxide] risk." *Id.* So Meadows "called [Child Protective Services]" about Eckert,[13] and Eckert then fixed the pipe. *Id.*

Although that should have ended the matter, sometime in April 2020, Meadows "noticed [that she had] difficulty breathing while in the driveway." *Id.* at 15. She told a Buffalo city inspector about this, but the inspector responded that "the fumes were 'only 5% [carbon monoxide].'" *Id.* After Meadows protested that this level of carbon monoxide was still too high, "Eckert was informed that she would need to move the pipe." *Id.* But Eckert "push[ed ]back" and "the [C]ity [of Buffalo] gave in[]." *Id.*

## II.    THE RESULTING PHYSICAL ALTERCATIONS

The dispute between Eckert and Meadows subsequently devolved into physical violence. On May 23, 2020, Meadows was "crouching near the ground[]" on the "disputed boundary between her property and Eckert's property." *Id.* at 17. Eckert then "walked up behind [Meadows], pushed the fence on top of her, and struck [Meadows] on the back of her head . . . and in the middle of [her] back with a cast iron skillet." *Id.* Eckert did this even though she "kn[e]w[] that Meadows is disabled." *Id.* As a result of the assault, Meadows was taken to the hospital where she was treated for her injuries, including "a concussion, collapsed lung, ear laceration[,] and contusions." *Id.* Although BPD officers were called to the scene, they initially "declined to p[re]ss charges against Eckert" and stated that Eckert was only "protecting her property." *Id.* at 18. After

---

[13] Meadows called the police three other times around the same period. Docket Item 134 at 12. Each time, the responding officers rebuffed Meadows's complaints and instead "directed [Meadows] to cease and desist." *Id.* at 12-13.

Meadows protested, an officer charged Eckert with "[f]elony [a]ssault" and Meadows with trespassing and harassment.  *Id.*

On May 2, 2022, Eckert and Meadows got into another physical altercation after Eckert "provoke[d] [Meadows]."  *Id.* at 41.  Eckert's son then "exacerbated" the situation by "throwing a rock from [Eckert's] porch that [Meadows] then threw at Eckert's car."  *Id.* The situation devolved into a "struggle over the rock," and Eckert's son "put[] [Meadows] in a chokehold" while Eckert took "several swings at [Meadows]."  *Id.* at 41-42.  Based on the BPD's "disparate treatment" of herself and Eckert, Meadows "feared the police" and "refuse[d] to speak with [them]" regarding the incident.  *Id.* at 42.

At some point, Eckert contracted COVID-19 and "put great effort" into giving the virus to Meadows, which constituted another kind of physical assault through the use of a "biological weapon."  *See id.* at 45, 67, 81, 92.

## III.   MEADOWS'S OTHER CONFRONTATIONS WITH ECKERT

In addition to the pipe problem and physical altercations, Meadows and Eckert had several other disputes about their properties.  *Id.* at 16, 19-20.  For instance, in June 2020, Meadows discovered that her "electrical mainline" had been damaged— likely by Eckert or one of her associates—but police told Meadows that "her car[] mirrors did the damage" even though that was not plausible.  *Id.* at 19.  Eckert also falsely accused Meadows of "cut[ting] the lock off her shed, st[ealing] her grill, and st[ealing] hundreds of dollars['] worth of tools."  *Id.* at 20.  A Buffalo police officer then "g[ave] Eckert a warrant for Meadows for theft, trespass, and mischief even though Eckert had no proof" of the incident.  *Id.*  Later, in August 2020, Eckert filed several other false complaints against Meadows.  *Id.* at 22-23.

In November 2020, "Meadows observed Eckert pouring epoxy out of her window and onto the driveway." *Id.* at 28. About a month later, a responding police officer who was called to the area "refused to intervene" when Eckert "took Meadows'[s] panels and broke them." *Id.* at 30. About a month after that, Eckert stole two eight-foot wooden posts from Meadows's driveway. *Id.* at 36. And at one point in March 2021, Eckert "dump[ed] a bag of dog feces at the property line." *Id.* at 38.

Eckert also installed multiple video cameras that recorded Meadows's property. *Id.* at 14, 16, 25, 28. Meadows then learned that Eckert had posted numerous videos of Meadows on Facebook and YouTube, including videos in which Meadows was only partially clothed. *Id.* at 26, 29, 34. In December 2020, Meadows "erect[ed] a pole with a sheet as a partition to prevent Eckert's roof cam[era] from peering into [Meadows's] backyard." *Id.* at 29. Eckert then stole the sheet. *Id.* Although the police "did a report for petit larceny," Meadows "was not given a warrant for Eckert's crime." *Id.* at 29-30.

Meadows's and Eckert's disputes extended beyond their properties. For example, Eckert "ma[de] numerous complaints" to various entities about Meadows. *Id.* at 14. For instance, she contacted "the [United States Department of Veterans Affairs,] alleging [that] Meadows would kill" the president. *Id.*; *see also id.* at 97. Eckert also "tr[ied] to get [Meadows's] nursing license revoked"; accused Meadows of food stamp and Social Security fraud; made "false child abuse allegations against Meadows"; and called a crisis services emergency phone line in an attempt to have Meadows "involuntarily committed to a psychiatric facility." *Id.* at 14, 22-23. Eckert also "file[d] fraudulent insurance claims against" Meadows's insurance policies. *Id.* at 33-34.

When Meadows once found a "loose dog" in her yard, she took it to the Buffalo animal shelter.  *Id.* at 32.  Apparently, the dog that Meadows took to the shelter was Eckert's, although Meadows was "unaware" of that.  *Id.*  Meadows then received "a summons . . . to appear in court for dog theft."  *Id.*

Eckert has "continue[d] to violate . . . [state] judicial orders" prohibiting her from recording Meadows and has continued to email Meadows despite a restraining order. *Id.* at 48.  She also has continued to "post[]" on social media about Meadows, "record[ed]" Meadows, and has even spoken on a "podcast" about Meadows in order to "intimidate Meadows" and "encourage" her social media "followers" to aid in the "discrimination and virtual assault" of Meadows.  *Id.* at 62.  In addition, Eckert has posted about her intention to "own [Meadows's] house" and has stated that she was going to "make [Meadows] move."  *Id.* at 44.  Further, Eckert has been allowed to access information about Meadows—including "all police reports made by and against Meadows" and certain "[p]rotected [h]ealth [i]nformation"—by filing New York Freedom of Information Law ("FOIL") requests.  *Id.* at 82-83.

Through all the above actions, Eckert has not only "harass[ed] and discriminat[ed]" against Meadows—she has "terroriz[ed] [Meadows] to the point where [Meadows] cannot live in peace and/or [is] forced to move."  *Id.* at 44.  In fact, Meadows now is "in the process of trying to finish updates on the home so it can be put on the market."  *Id.* at 45.  And Meadows says that "Eckert has isolated her attacks to only Black[] [people]" and has committed various actions that are racist.  *See id.* at 108-12.

IV.      ROLE OF THE POLICE AND PROSECUTORS[14]

Meadows repeatedly reported Eckert's actions to members of the BPD.  *See,*

*e.g.*, *id.* at 11-12, 21-22.  Although BPD officers frequently responded to Eckert's claims

by "direct[ing] [Meadows] to cease and desist," "prepar[ing] reports against [Meadows],"

or "issu[ing] warrant cards against [Meadows]," they refused to take the same actions

against Eckert in response to Meadows's complaints.  *Id.* at 12-13.  In fact, the police

"have told [Eckert] that [Meadows] is crazy" and that Eckert should "keep her cameras

up."[15]  *Id.* at 47.  "[O]n several occasions," the police have "told Eckert, in front of

Meadows . . . that [Eckert] can do whatever she wants on her property even if it

transgresses on Meadows'[s] personal rights."  *Id.*  And the BPD has sent a "Behavioral

Response Team" and "Crisis Services" to Meadows's home in an attempt to "have

[Meadows] evaluated."  *Id.*  The BPD also "provided Meadows'[s] medical information to

the [Erie County District Attorney] without [Meadows's] consent."  *Id.* at 83.

In addition to enlisting the BPD to stop Eckert from harming her, Meadows also

sought the assistance of Erie County prosecutors, but to no avail.  First, in July 2020,

Meadows "went to Buffalo City Court to file the [f]elony [a]ssault warrant card" for

Eckert's May 2020 assault of Meadows.  *Id.* at 21.  Meadows obtained the card and left,

but "the warrant clerk [then] called Meadows and told her to return to the court."  *Id.*  At

that point, Meadows learned that "the [Assistant District Attorney had] changed [the]

---

[14] As noted above, Meadows sues Erie County and three of its prosecutors—
District Attorney Flynn and Assistant District Attorneys Schoemick and Gordon.
Meadows does not always specify which prosecutor was involved in a given encounter.

[15] The Erie County prosecutors also told Eckert to keep her cameras up.  Docket
Item 134 at 47.

charge [against Eckert] from a felony to a misdemeanor." *Id.* Meadows "went upstairs" to protest this decision, but Schoemick, the prosecutor then assigned to the case, told her that Eckert's assault could not have been "that serious" because Eckert "wasn't arr[e]sted." *Id.* Meadows "declined to accept the decreased charges." *Id.*

Upset with Schoemick's decision, Meadows staged a "daily protest of the [Erie County District Attorney's O]ffice" during the first week of August 2020. *Id.* at 22. Meadows then was "called up to the [District Attorney's O]ffice and met with Erie County [i]nvestigators," who "refer[red] her case for prosecution to a new [Assistant District Attorney]." *Id.*

On August 13, 2020, defendant Gordon "reached out[] via email[] to inform Meadows that he was the new [Assistant District Attorney]" assigned to her case. *Id.* at 24. Meadows then sent additional information to Gordon, but Gordon "never responded to Meadows['s] inquiry on [possible] charges against Eckert." *Id.* After Meadows "questioned Gordon about the racial bias being displayed by the [Erie County District Attorney's Office]," Gordon "told Meadows to 'be courteous' if she wanted to be deemed 'credible.'" *Id.* Meadows then filed a complaint about the Erie County District Attorney's Office with the New York State Attorney General. *Id.* at 25. Eckert ultimately was charged with only a misdemeanor "despite Meadows['s] protest[s]." *Id.*

Meadows also "reached out to [District Attorney] Flynn . . . numerous times in 2020 and 20[21] to inform him of the disparate/differential treatment" of Eckert's and Meadows's complaints about each other. *Id.* Meadows likewise repeatedly reached out to Flynn and Gordon in 2020 and 2021 to "obtain their assistance in getting the [BPD] to follow through on the complaints she was making about Eckert." *Id.* at 31. But neither

Flynn nor Gordon responded to Meadows's inquiries.  *Id.*  And despite the fact that the prosecutors "knew that [Meadows]" had received "a potentially life[-]changing injury" at Eckert's hands, they "failed to issue an order of protection to [Meadows] . . . for more than six months after the attack."  *Id.* at 43, 69.

At grand jury proceedings regarding a felony charge against Eckert, special prosecutor "Stephen Dilorenzo . . . willfully withh[e]ld facts and evidence . . . by not showing [certain] videos of Eckert and [by] not disclosing Buffalo City Court transcripts" about the fact that Eckert had COVID-19.  *Id.* at 45, 67.  That led the grand jury to "return[] a 'no bill'" against Eckert so that criminal charges were dismissed.  *Id.* at 45.  Another special prosecutor, "Chris Starosik . . . violated [a] verbal agreement [between Meadows and Dilorenzo]" by allowing Eckert to plead guilty to reduced charges.[16]  *Id.* at 46.  In fact, Starosik compiled more information on Meadows than on Eckert for his prosecution file.  *Id.*

In contrast to their failure to sufficiently charge Eckert, the Erie County prosecutors "press[ed] the most insignificant and often untrue charges" against Meadows and treated her unfairly.  *Id.* at 2.  In one case[17] brought against Meadows, for example, "[the District Attorney] . . . withh[e]ld evidence by not supplying [Meadows's] land survey" and by failing to "disclose this lawsuit" as "required."  *Id.* at 40.  In fact,

---

[16] Meadows does not name Dilorenzo or Starosik as defendants in this action. *See* Docket Item 134 at 1.

[17] Meadows does not say when this case was brought or what it concerned.

Assistant District Attorney "Emmerling"[18] "ignored" the land survey—even though it "cleared" Meadows—and refused to "withdraw[] [a] property claim" brought against her. *Id.* at 40.  And after the May 2022 altercation between Eckert and Meadows, Meadows was charged with "menacing" and "violating an[] order of protection."  *Id.* at 42.  Later, she also was charged with "assault" even though Eckert had "no injuries"  and even though the District Attorney "reduc[ed]" Eckert's charges.  *Id.*

On another occasion, an unnamed county prosecutor "attempted to 'set[-]up' Meadows" by ensuring that a particular judge who is "known for her aggressiveness on the bench" would arraign Meadows.  *Id.* at 65.  The plot was thwarted when the judge "called in sick" and another judge "did not give a full restraining order despite the [Assistant District Attorney's] asking for it."  *Id.* at 66.  The prosecutor then "went upstairs" and "attempted to have . . . the terms of the arraignment" altered, but that attempt failed when the judge refused to do so.  *Id.*

In addition to their role in charging Meadows, the Erie County prosecutors violated her right to privacy by giving Meadows's medical records to Eckert's counsel; in contrast, Meadows's FOIL requests for "Eckert's police reports" were denied by "[a]ll agencies."  *Id.* at 82-83.  Gordon and "other [assistant district attorneys]" also were "negligent" in "not disclosing evidence" against Eckert.  *Id.* at 94.  Although "Meadows has filed grievances with the Grievance Committee [regarding the prosecutors' conduct]," no information has been provided to her about the "investigations, if any" that have resulted from her complaints.  *Id.* at 90.

---

[18] Meadows does not name "[Assistant District Attorney] Emmerling"—who is not otherwise identified—as a defendant in this suit, nor does she include any other allegations against that person.  Docket Item 134 at 1, 40; *see generally id.*

Thus, Meadows says, BPD, Erie County, and their various officers and employees "appear to be following a policy of not taking, or minimizing, Black complaints against Whites while overly enforcing the law when the complainant is White and the accused is Black."[19]  *See id.* at 19-20, 22-29, 31-32.  And she says that "Flynn['s] fail[ure] to properly train and supervise his staff" caused the Erie County prosecutors to "wrongly reduce[] or refuse[] to file criminal charges against Eckert while prosecuting [Meadows] for unsubstantiated claims."  *Id.* at 41.  The Erie County prosecutors' "insufficient investigations," Meadows says, essentially "ratified" Eckert's actions and "numerous false reports."  *Id.* at 43.  And Meadows alleges that "[a]ll defendants . . . conspire[d] to deprive [her] of her property and constitutional rights."  *Id.* at 45.

## LEGAL PRINCIPLES

### I.   MOTION FOR RECONSIDERATION

"[Federal] Rule [of Civil Procedure] 54(b) gives district courts broad discretion to reconsider, reverse, or modify interlocutory orders previously entered in a case." *Vornado Realty Tr. v. Marubeni Sustainable Energy, Inc.*, 987 F. Supp. 2d 267, 275 (E.D.N.Y. 2013).  Notwithstanding that discretion, the Second Circuit has held that "[t]he standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court

---

[19] Meadows says that Erie County's "blatant bias in investigating and appl[ying the] law" in the disputes between Eckert and Meadows may be an attempt to "retaliat[e]" against her for bringing other lawsuits against the County.  *See* Docket Item 134 at 22, 78-79.

overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (citation and internal quotation marks omitted).

## II.    MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

## <u>DISCUSSION</u>

## I.    MEADOWS'S MOTION FOR RECONSIDERATION

In its previous order, this Court dismissed "Meadows's official-capacity claims against the Erie County prosecutors that d[id] not relate to any office policy . . . because those claims are barred by sovereign immunity." *See* Docket Item 127 at 12. As the Court explained, because New York State prosecutors act "on behalf of the state . . . when prosecuting a criminal matter," *Schnitter v. City of Rochester*, 556 F.

App'x 5, 9 n.4 (2d Cir. 2014) (summary order) (citing *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988)), claims against "a district attorney or an assistant district attorney" for prosecutorial acts are barred by sovereign immunity, *D'Alessandro v. City of New York*, 713 F. App'x 1, 8 (2d Cir. 2017) (summary order).

Meadows asks this Court to "reconsider it[s] decision to dismiss [her] claim against the [Erie County District Attorney or other attorneys in that office] and/or the [District Attorney's Office]" because they "acted outside of [their] authority" when they "interfered with the warrant phase of charges."  Docket Item 133 at 2.  She adds that the Erie County prosecutors behaved in other ways that put them "in a police/investigatory role" and "relieve[d] [them] of immunity."  *Id.* at 2-3.

In seeking reconsideration, Meadows has not cited any new "law" or "evidence" that might cause this Court to revisit its prior decision, nor has she shown that there is a "need to correct a clear error or prevent manifest injustice."[20]  *See Virgin Atl. Airways, Ltd.*, 956 F.2d at 1255.  Even if the motion is construed broadly, the only new "fact" Meadows offers is that the Erie County prosecutors at times acted "outside" the scope

---

[20] The Erie Count defendants argue that Meadows's motion for reconsideration should be denied as "untimely" without considering its merits because Meadows filed the motion "thirty days [after] . . . the maximum twenty-eight[-]day period prescribed in Federal Rule of Civil Procedure 59(e) for bringing such a motion."  Docket Item 137 at 5.  But that rule applies only to motions to "alter or amend a judgment."  Fed. R. Civ. P. 59(e).  Because the Court's prior order "adjudicate[d] fewer than all the claims or the rights and liabilities of fewer than all the parties," it may be "revised" under Rule 54(b) "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b); *see Williams v. Cnty. of Nassau*, 779 F. Supp. 2d 276, 280 & n.2 (E.D.N.Y. 2011) (finding that time limit imposed by Federal Rule of Civil Procedure 59(e) did not apply to motion for reconsideration of "non-final, interlocutory, and non-appealable" order); *Mallek v. Allstate Ins. Co.*, 2023 WL 3513783, at *2 (2d Cir. May 18, 2023) (summary order) (holding that "the district court's reconsideration of [a non-final] order was proper under Rule 54(b)").  The Court therefore considers the merits of Meadows's motion to reconsider.

of their authority.  *See* Docket Item 133 at 2-3.  But that assertion is irrelevant to the

Court's holding that Meadows's official-capacity claims against prosecutors for acts

undertaken in their role as prosecutors are barred by sovereign immunity.  In fact, the

Court specifically allowed Meadows to amend her complaint "to state viable claims

against the Erie County prosecutors" *other* than in their official capacities, *see* Docket

Item 127 at 15, and Meadows then amended her complaint, Docket Item 134, which the

Court considers below.  So the Court sees no reason to reconsider its prior holding

dismissing Meadows's official-capacity claims here.[21]

      Meadows's motion for reconsideration therefore is denied.

## II.    ERIE COUNTY DEFENDANTS' MOTION TO DISMISS[22]

      In her first amended complaint, Meadows alleged that the Erie County

prosecutors violated her rights by failing to investigate and to bring sufficiently serious

---

[21] In a handwritten addendum to her motion for reconsideration, Meadows asserts that "although the [District Attorney] cannot be told who or who [n]ot to prosecute, the disparate treatment in prosecuting claims speaks to both the fair and equal access to courts [a]s well as the [FHA]/malicious prosecution [claims]."  Docket Item 134 at 3.  The Court understands this as an argument that the Court should not have dismissed her claims related to Eckert's non-prosecution, *see* Docket Item 127 at 12-13, 28.  Indeed, Meadows reasserts those claims in her second amended complaint on this same theory.  *See, e.g.*, Docket Item 134 at 21-24, 31-32, 43; Docket Item 145 at 10-11.

The Court generally does not consider on motions for reconsideration "additional arguments that could have been raised before the decision."  *Ifedigbo v. Buffalo Pub. Sch.*, 2018 WL 2901331, at *1 (W.D.N.Y. June 11, 2018).  So it declines to grant the motion for reconsideration on those grounds.  And in any event, Meadows's claims related to Eckert's non-prosecution are not viable for the reasons explained below.

[22] The Erie County defendants argue that Meadows's second amended complaint "should be[] stricken or dismissed[] without leave to further amend[] for non-compliance with Federal Rule of Civil Procedure 8(a)[]."  Docket Item 143 at 6-7.  That rule requires that "[a] pleading that states a claim for relief . . . contain . . . a *short and plain* statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ.

charges against Eckert while "press[ing] the most insignificant and often untrue charges" against her.  *See* Docket Item 44 at 28, 35; Docket Item 127 at 11-13 (summarizing those claims).  In its prior decision and order, this Court found that neither set of allegations stated a viable claim.  *See* Docket Item 127 at 11-15.  More specifically, the Court dismissed without leave to amend her official-capacity claims against the Erie County prosecutors as well as her claims related to the failure to investigate or prosecute Eckert, *see id.* at 11-13, and it found that her other claims against those defendants were subject to dismissal based on prosecutorial immunity, *see id.* at 13-15.  But in light of Meadows's *pro se* status, the Court allowed her to amend her complaint to state viable claims against the Erie County prosecutors.  *Id.* at 15.  The Court explicitly advised Meadows that any amended complaint must allege facts showing why her claims were not barred by prosecutorial immunity.  *Id.*

---

P. 8(a) (emphasis added).  The Erie County defendants argue that Meadows's second amended complaint is neither short nor plain and that it should be dismissed on that basis.  *See* Docket Item 143 at 3-7.

It is true that "[w]hen a complaint fails to comply with the Rule 8 requirements, the district court has the power, on motion or *sua sponte*, to dismiss the complaint or to strike such parts as are redundant or immaterial."  *Celli v. Cole*, 699 F. App'x 88, 89 (2d Cir. 2017) (summary order) (alterations, citation, and internal quotation marks omitted). But "dismissal for violation of Rule 8 is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  *Id.* (citation and internal quotation marks omitted). And because the Court finds that Meadows's second amended complaint fails to state a claim against the Erie County defendants and dismisses her claims against those defendants on that basis, it declines to strike the complaint for failure to comply with Rule 8.

In her voluminous second amended complaint, Meadows brings a variety of claims against Flynn, Schoemick, and Gordon,[23] including "[c]onspiracy to [i]nterfere with [c]ivil [r]ights"; "[f]ailure to [p]revent [h]arm"; "[f]alse [arrest] and [malicious] prosecution[]"; violation of "[s]ubstantive [d]ue [p]rocess"; "[f]ailure to [s]upervise, [d]iscipline, and/or [t]rain"; "[d]enial of [a]ccess to the [c]ourts"; "[c]onspiracy to [o]bstruct [j]ustice"; "[h]arassment and the creation of hostile home environment"; "[i]ntentional infliction of emotion dist[ress]"; and "[v]iolation of [p]rivacy and personal data." Docket Item 134 at 49-50. Elsewhere in the complaint, she asserts claims against the Erie County prosecutors for "[e]xcessive [f]orce" and "[u]nlawful seizure," *id.* at 52-53; "[r]etaliation," *id.* at 78-80; "[c]onspiracy to [v]iolate . . . First Amendment [r]ights," *id.* at 86; "[c]onspiracy to [v]iolate [t]he Equal Protection Clause," *id.* at 87; and "[c]onspiracy to . . . [c]ommit [b]attery," *id.* at 91.[24]

The Erie County defendants say that none of Meadows's allegations against them in the second amended complaint state a viable claim. *See* Docket Item 143 at 10-25. This Court agrees.

### A.    Claims Related to Eckert's Non-prosecution

First, Meadows alleges that although she reached out to Flynn, Schoemick, and Gordon at various times, they either failed to investigate Eckert or failed to bring

---

[23] Meadows does not assert all claims against all three prosecutors. *See, e.g.*, Docket Item 134 at 49-50.

[24] Bolding and underlining have been omitted from the quotations throughout the footnoted sentence. In delineating her various causes of action, Meadows cites various statutes and constitutional provisions, although the connection between a given cause of action and the legal provisions cited with it is not always clear. *See* Docket Item 134 at 52-114.

sufficiently serious charges against her. *See, e.g.*, Docket Item 134 at 21-25, 31-32, 43. But in its previous order, this Court held that Meadows had no viable claim related to the failure to investigate or prosecute Eckert, and it dismissed those claims without leave to amend. Docket Item 127 at 13, 28. Meadows argues that the allegations nonetheless constitute viable claims because her second amended complaint is not asserting claims "for non[-]prosecution but for disparate treatment and the failure to provide equitable treatment." *See* Docket Item 145 at 9-10; *see also id.* at 11 ("Again, [Meadows's] complaint is not about non-prosecution but about bias, disparate treatment, discriminatory conduct, and retaliation[.]"). Indeed, she says, through their "[s]elective enforcement" of the law, the Erie County prosecutors—along with the other defendants—essentially denied Meadows "access" to justice that prevented her from "obtain[ing] interventions that could have prevented" a subsequent "assault" by Eckert. Docket Item 134 at 72-73; *see also id.* at 81-82, 94-95 (other allegations related to Erie County prosecutors' failure to charge Eckert and the harm that imposed upon Meadows).

Meadows's recharacterization of her previously dismissed claims does not make them viable. As this Court explained in its prior decision, "a private citizen lacks a judicially cognizable interest in the prosecution or non[-]prosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). That is so even when the private citizen is the victim of a crime because "a crime victim who sues to force the prosecution of the person who did [her] wrong was injured by that person, not by the failure to prosecute that person." *Brady v. Schneiderman*, 2016 WL 3906737, at *3 (S.D.N.Y. July 13, 2016) (alterations omitted), *aff'd*, 714 F. App'x 60 (2d Cir. 2018). In fact, as the Supreme

Court recently explained, an individual "lacks standing to contest the policies of the prosecuting authority when [that person] is neither prosecuted nor threatened with prosecution." *United States v. Texas*, 599 U.S. 670, 674 (2023) (quoting *Linda R.S.*, 410 U.S. at 619).

Here, Meadows was prosecuted, and so she may have standing to challenge the prosecutors' "bias, disparate treatment, [and] discriminatory conduct" as it pertains to her own prosecution. *See* Docket Item 145 at 11; *see also Texas*, 599 U.S. at 674. Indeed, this Court previously gave Meadows leave to amend her claims related to her own prosecution, *see* Docket Item 127 at 13-15, and it addresses those claims below. But as a private citizen, or even as a crime victim, Meadows has no standing to challenge the prosecutors' failure to investigate and charge Eckert. *See Brady*, 2016 WL 3906737, at *3; *Texas*, 59 U.S. at 674. And her assertion that the prosecutors' failure in that regard resulted from a discriminatory policy does not change that conclusion. *See Parkhurst v. Tabor*, 569 F.3d 861, 866 (8th Cir. 2009); *cf. Texas*, 599 U.S. at 681 (noting that although "selective-prosecution claims [are cognizable] under the Equal Protection Clause," in such cases "a party typically seeks to prevent [that party's] own prosecution, not to mandate additional prosecutions against other possible defendants").

As the Eighth Circuit has explained, the courts have followed the Supreme Court's distinction in *Linda R.S.* and have "distin[guished] . . . between those prosecuted by the state"—who have standing to challenge selective prosecution—and "those who would urge the prosecution of others"—who do not, "even when the failure to prosecute was allegedly discriminatory." *Parkhurst*, 569 F.3d at 866 (collecting cases). Therefore,

Meadows has no viable claim based on the harm that she alleges she suffered due to the Erie County prosecutors' failure to investigate and charge Eckert. *See Johnson v. Carrasquilla*, 2018 WL 4963165, at *1, 11 (D. Conn. Oct. 15, 2018) (finding that plaintiffs who "allege[d] that they were singled out for attorney disciplinary proceedings due to their race and civil rights practice" could not assert claims based on "[defendants'] fail[ure] to investigate *other* attorneys when [p]laintiffs asked them to . . . because they suffered no injury from the defendants' enforcement decisions in cases involving other lawyers" (citations omitted)), *aff'd sub nom. Miller v. Carrasquilla*, 830 F. App'x 42 (2d Cir. 2020); *Parkhurst*, 569 F.3d at 866-67 (holding that plaintiffs who "claim[ed] to have been injured by a failure to prosecute" a specific individual pursuant to "a discriminatory prosecutorial policy[] did not suffer injury in fact" and finding no case law to support purported "right to compel prosecution of a wrongdoer").[25]  So to the extent that the second amended complaint reasserts claims against Flynn, Schoemick, and Gordon for failing to investigate or charge Eckert, those claims are dismissed.

---

[25] In *Parkhurst*, the Eighth Circuit distinguished claims based on "the allegedly discriminatory provision of police protection" from those based on discriminatory prosecutorial conduct. *See Parkhurst*, 569 U.S. at 866.  It noted that "[w]hile police officers are under a statutorily imposed duty to enforce the laws equally and fairly, whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion." *Id.* at 867 (citations and internal quotation marks omitted).  What is more, even if Meadows had standing to challenge the failure to investigate or charge Eckert, those claims would be barred by prosecutorial immunity. *See Johnson*, 2018 WL 4963165 , at *11 (noting that "decision not to investigate or not to initiate disciplinary proceedings against others is squarely protected by absolute immunity").

B.      **Claims Related to Meadows's Prosecution**

Meadows also brings claims against the Erie County prosecutors related to her

own prosecution.  *See, e.g.*, Docket Item 134 at 39-41, 59.  She asserts that the Erie

County prosecutors—whom she does not always clearly identify[26]—brought charges

against her even though they knew that those charges were false and despite the

"exonerating evidence" she provided them.  *See id.* at 39-41, 43.  She also says that

those prosecutors failed to comply with proper discovery procedures when they

provided inadequate information to Meadows and too much information to Eckert.  *See*

*id.* at 59.  And she says that on one occasion, the prosecutors tried to manipulate

arraignment proceedings by selecting the judge and then by exerting influence on the

judge outside court.  *Id.* at 65-66.

This Court previously found that Meadows's claims related to her own

prosecution were subject to dismissal based on prosecutorial immunity.  Docket Item

127 at 13-15.  As the Court explained in its previous order, prosecutors are absolutely

immune from suit for any activities that are "intimately associated with the judicial phase

of the criminal process."  *Id.* at 14 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430

(1976)).  That immunity

> encompasses not only [prosecutors'] conduct of trials but all of their
> activities that can fairly be characterized as closely associated with the
> conduct of litigation or potential litigation, including presentation of evidence

---

[26] In fact, it seems that some of the acts that Meadows attributes to the District
Attorney's Office were not taken by any of the prosecutors named as defendants.  *See,*
*e.g.*, Docket Item 134 at 40, 45-46.  Nonetheless, the Court analyzes all allegations
against prosecutors made in the complaint, and for the reasons that follow, it finds that
all fail to state a viable claim regardless of whether the prosecutorial conduct alleged
was that of one of the named defendants.

to a grand jury to initiate a prosecution, activities in deciding not to do so, and conduct of plea bargaining negotiations.

*Barrett v. United States*, 798 F.2d 565, 571-72 (2d Cir. 1986) (citations omitted); *see also Ogunkoya v. Monaghan*, 913 F.3d 64, 72 (2d Cir. 2019) (explaining that prosecutors have absolute immunity for decisions and acts that "constituted an exercise of their prosecutorial discretion in preparing a case for indictment and deciding when, where, and how to prosecute"). "Nor do [a] plaintiff's allegations of conspiracy alter this rule[.]" *Hill v. City of New York*, 45 F.3d 653, 661 (2d Cir. 1995) ("[A]bsolute prosecutorial immunity extends even to conspiracies to present false evidence at trial . . . [or] in the grand jury setting.").

But prosecutors are not absolutely immune from lawsuits that challenge their "acts of investigation or administration." *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994). "The key inquiry is whether the prosecutors' alleged wrongdoing took place in the course of administration or investigation not undertaken in preparation for judicial proceedings." *Vann v. City of Rochester*, 2019 WL 2646616, at *3 (W.D.N.Y. June 27, 2019) (citation and internal quotation marks omitted).

The Erie County prosecutors' decisions to bring charges against Meadows—and their presentation of evidence—clearly are "activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation," and the prosecutors therefore are protected by absolute immunity in connection with those activities.[27] *See Barrett*, 798 F.2d at 571-72*; see also Vann,* 2019 WL 2646616, at *5

---

[27] Meadows asserts that the Erie County prosecutors are not absolutely immune because the District Attorney's Office was "place[d] . . . in the role of an investigator" by the failure of the BPD officers to "do their job," which then required the Erie County prosecutors to investigate her claims. Docket Item 134 at 103. And she says the prosecutors' investigative role is further confirmed by the fact that the Erie County

(finding that prosecutors' conduct in "present[ing] . . . evidence to the grand jury" and "alleged[ly] fail[ing] to turn over [exculpatory] material" was absolutely immune from challenge).  Likewise, the Erie County prosecutors are immune from suit based on their conduct in turning over trial-related materials.  *See D'Alessandro*, 713 F. App'x at 7 ("[E]ven when a prosecutor is legally required to turn over evidence to opposing counsel, she still retains her absolute immunity for failing to provide that evidence."); *Van de Kamp v. Goldstein*, 555 U.S. 335, 344 (2009) (finding that prosecutors are absolutely immune from suit in connection with performing "administrative obligation[s] [that are] directly connected with the conduct of a trial").  Thus, Meadows's allegations related to all those actions fail to state a viable claim.[28]

On the other hand, the prosecutors' actions in seeking to influence the judge who arraigned Meadows, Docket Item 134 at 65-66, were done outside the course of the judicial process and therefore are not acts shielded by absolute immunity.  *Imbler*, 424

---

District Attorney's Office assigned investigators to "collect[] Meadows'[s] statement for the prosecution of Eckert" and by Schoemick's refusal to bring sufficiently serious charges against Eckert, which Flynn then ratified by his failure to "correct[] [Schoemick]."  *Id.* at 103-04.

But those actions concern prosecutors' decision to bring charges—or not—against Eckert, not any prosecution of Meadows, and so any claims based on that conduct are dismissed for the reasons already explained.  And in any event, "[i]t is well-settled that the decision to initiate prosecution, what charges to bring, and how to perfect and consolidate those charges is a quintessential prosecutorial function."  *Vann*, 2019 WL 2646616, at *3 (alterations, citation, and internal quotation marks omitted).

[28] That includes Meadows's allegations that by prosecuting her—and not prosecuting Eckert to the same degree—the prosecutors were "retaliating" against Meadows for engaging in activities protected by the First Amendment and for filing other lawsuits against Erie County.  *See* Docket Item 134 at 22, 78-80, 86-87; *see also Norton v. Town of Islip*, 97 F. Supp. 3d 241, 255-56 (E.D.N.Y. 2015) (finding that absolute prosecutorial immunity barred First Amendment retaliation claims when alleged retaliatory action was taken in prosecutors' capacity as advocates).

U.S. at 430.  But those allegations nevertheless still fail to state a claim on which relief may be granted.

      A claim that a local or state official violated a plaintiff's constitutional rights is cognizable under 42 U.S.C. § 1983.  "To state a valid claim under [that section], the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States."  *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)).  The second amended complaint makes clear that the attempt by the unknown prosecutor to "appoint[]" a particular judge to arraign Meadows—and a subsequent attempt to influence that judge outside court—were unsuccessful.  *Id.* at 65-66.  And so Meadows has not shown that she was deprived of any "right, privilege or immunity" based on that conduct.[29]  *See Whalen*, 126 F.3d at 405.

      Finally, the Court notes that in her second amended complaint, Meadows includes various policy reasons why the Court should not apply prosecutorial immunity here.  Docket Item 134 at 102-08.  Those arguments may be sound ones, but the Court

---

[29] Meadows alleges—in conclusory fashion—that the Erie County District Attorney's Office was involved in a conspiracy to subject her to unreasonable searches and seizures in violation of the Fourth Amendment.  Docket Item 134 at 63.  Such conduct also may well fall outside the scope of absolute prosecutorial immunity.  But Meadows does not provide any facts regarding how any Erie County prosecutors were involved in those alleged searches.  And so those allegations likewise fail to state a viable claim under section 1983.  *See Houghton v. Cardone*, 295 F. Supp. 2d 268, 273 (W.D.N.Y. 2003) ("[A]llegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under [section] 1983." (citation omitted)).

has no ability to consider them, given the clear precedents—summarized above—that govern this area of law.

Accordingly, all claims against the Erie County prosecutors related to Meadows's prosecution are dismissed.

### C.      Other Claims Involving the Erie County Prosecutors

Meadows also asserts claims against the Erie County prosecutors under the First Amendment and New York State law for the prosecutors' alleged failure to provide her with information about disciplinary proceedings based on her complaints.  Docket Item 134 at 90 (stating that "Meadows has filed grievances with the Grievance Committee in regard[] to the [Erie County prosecutors] and has been denied . . . knowledge of the investigations, if any."); *see also id.* at 89-91.  For two reasons, those claims are dismissed.

First, Meadows does not allege that any such proceedings were initiated; rather, she alleges only that she lodged complaints with the Grievance Committee.  *Id.* at 90. So this Court has no reason to conclude that there are such proceedings.  Second, and even more basically, Meadows provides no reason to believe that the Erie County prosecutors control—or even have access to—the information or records that she requested.  In fact, because Meadows asserts that she has been denied access to Grievance Committee proceedings—not those of the Erie County District Attorney's Office—any records and information would come from the Grievance Committee, not from the Erie County prosecutors.  Therefore, Meadows has not raised a viable First Amendment right of access claim against the Erie County prosecutors, and the claims

29

against them related to her request for Grievance Committee records and information therefore are dismissed.

### D.   *Monell* Claim

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), "the Supreme Court established that municipalities may be construed as 'persons' in the context of violations of section 1983, and that they may be subjected to direct claims for monetary, declaratory, or injunctive relief where the municipality allegedly implemented an unconstitutional custom or policy." *Montero v. City of Yonkers*, 890 F.3d 386, 403 (2d Cir. 2018). "[T]he plaintiff must show 'a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) (quoting *City of Canton v. Harris*, 489 U.S. 378 (1989)).

In its previous order, this Court found that Meadows attempted to assert a *Monell* claim against Erie County based on an alleged policy of failing to prosecute "Black complaints against White[]" individuals while over-prosecuting "when the complainant is White and the accused is Black." Docket Item 44 at 22. But the Court found that the allegations failed to state a viable claim because they boiled down to complaining about the failure to prosecute Eckert and the decision to prosecute Meadows. Docket Item 127 at 15-17.

As the Court explained, Meadows cannot assert a *Monell* claim based on the prosecution (or non-prosecution) of either Eckert or Meadows for two reasons. *See id.* at 16. First, as discussed above, Meadows has no constitutional right to have the Erie County prosecutors investigate or charge Eckert, and so she has no viable section 1983 claim for the denial of a constitutional right based on the failure to bring charges. *Id.*

Second, Meadows's own prosecution also could not constitute the basis for a *Monell* claim against Erie County because a prosecutor's charging decisions are attributable to the state, not the county. *Id.* at 16-17; *Kellner v. City of New York*, 2021 WL 4251343, at *17 (E.D.N.Y. Sept. 17, 2021) (stating that "[t]he Second Circuit . . . has consistently held that inherently prosecutorial functions (i.e., decisions whether to prosecute) are controlled by state policies for purposes of *Monell*, and therefore a prosecutor's decision whether to prosecute an individual may not form the basis for *Monell* liability" (citations and internal quotation marks omitted)).

In her second amended complaint, Meadows reasserts her *Monell* claim based on the same alleged policy. *See* Docket Item 134 at 25 ("[Erie] County . . . appear[s] to be following a policy of not taking, or minimizing, Black complaints against Whites while overly enforcing the law when the complainant is White and the accused is Black."); *see also id.* at 32, 113. She seeks to substantiate that claim based on assertions related to past discrimination by other Erie County entities and cites a lawsuit she brought against the County that subsequently was settled. *See id.*100-102; Docket Item 145 at 9. And she points to two other cases in Erie County in which, in her telling, no charges were brought against white people who committed violent crimes against Black people. Docket Item 134 at 113.

The conduct that Meadows describes is egregious, but it does not change the conclusion reached by the Court in its previous decision. Again, Meadows asserts a constitutional injury based on the charging decisions of the Erie County District Attorney's Office. And again, those charging decisions simply cannot form the basis of a *Monell* claim. *See Kellner*, 2021 WL 4251343, at *17; *see also DeJean v. Cnty. of*

*Nassau,* 2008 WL 111187, at *3 (E.D.N.Y. Jan. 8, 2008) (holding that a county could not "be held liable for the actions of [the county's district attorney] . . . in . . . deci[ding] not to prosecute" law enforcement officer that arrested plaintiff); *Ortiz v. Case*, 2019 WL 1236413, at *7 (W.D.N.Y. Mar. 18, 2019) (holding that because prosecutors were "acting as agents of New York State" in making charging decisions, sovereign immunity barred "claims challeng[ing] [prosecutors'] decisions to initially prosecute [p]laintiff despite the claimed weakness of the evidence against him"), *aff'd*, 782 F. App'x 65 (2d Cir. 2019).  Meadows's *Monell* claim against Erie County therefore is dismissed.

### E.     Failure to State a Claim Against the Erie County Defendants

In sum, and for the reasons stated above, none of Meadows's allegations state claims against Flynn, Schoemick, Gordon, or Erie County.  Their motion to dismiss therefore is granted.

## III.   ECKERT'S MOTION TO DISMISS

In the second amended complaint, Meadows asserts—as she did in her first amended complaint—claims against Eckert under 42 U.S.C. §§ 1981-1983 and 1985-1986, the ADA, and the FHA.  *See* Docket Item 127 at 18; Docket Item 134 at 3, 52-114.  In addition, Meadows raises claims against Eckert under Title VII of the Civil Rights Act, as well as for malicious prosecution, "conspiracy to release protected information," and "conspiracy to commit battery."  Docket Item 134 at 50, 67, 76, 82, 84, 91, 93, 98 (bolding and capitalization omitted).

A.      42 U.S.C. § 1983 Claims

As already explained, section 1983 requires a plaintiff to "allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen*, 126 F.3d at 405. So to state a viable claim against Eckert under section 1983, Meadows must first show that Eckert was "acting under color of state law," *id.*; *see also* Docket Item 127 at 20-21.

The Second Circuit has "identified three main tests to determine" whether an otherwise private entity has engaged in state action:

> (1) whe[ther] the entity acts pursuant to the coercive power of the state or is controlled by the state ('the compulsion test'); (2) whe[ther] the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ('the joint action test' or 'close nexus test'); and (3) whe[ther] the entity has been delegated a public function by the state ('the public function test').

*Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022) (alterations omitted) (quoting *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012)). "The fundamental question under each test is whether the private entity's challenged actions are 'fairly attributable' to the state." *Fabrikant*, 691 F.3d at 207 (quoting *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982)).

Meadows's claim of state action is based on the second test. She says that Eckert acted "in concert [with] and under the encouragement of the [BPD]." Docket Item 134 at 47. As evidence of that claim, Meadows says that "on several occasions," she has witnessed BPD officers tell Eckert that "she can do whatever she wants on her property even if it transgresses on Meadows'[s] personal rights." *Id.* In addition, Meadows asserts that Eckert said that "the police have told her that [Meadows] is crazy"

33

and that both the BPD and the Erie County prosecutors "told [Eckert] to keep her cameras up." *Id.* And she says that by "fil[ing] charges[] and prosecut[ing] Meadows without proper investigation," the government officials have afforded Eckert "a measure of *de facto* deputy status"—that is, "Eckert was able to have Meadows arrested and prosecuted at will based on nothing but [her] word."[30] *Id.* at 53 (italics added).

But all that is not enough to make Eckert a state actor for the purposes of section 1983. To start, "merely conclusory allegation[s] that a private entity acted in concert with a state actor do[] not suffice to state a [section] 1983 claim against the private entity." *Alicea v. Yang*, 2023 WL 5994211, at *2 (2d Cir. Sept. 15, 2023) (summary order) (citation omitted). Moreover, "[t]he provision of information to or summoning of police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of [section] 1983." *Young v. Suffolk Cnty.*, 705 F. Supp. 2d 183, 196 (E.D.N.Y. 2010) (collecting cases). Nor are "communications between a private and state actor" enough "without facts supporting a concerted effort or plan between the parties." *Morpurgo v. Inc. Vill. of Sag Harbor*, 697 F. Supp. 2d 309, 338 (E.D.N.Y. 2010), *aff'd*, 417 F. App'x 96 (2d Cir. 2011) (summary order) (alterations and citation omitted).

So the fact that Eckert called and had discussions with police—as well as the fact that she has relatives employed by Erie County—is not enough to make her a state actor. And Meadows has not pleaded any other facts suggesting that Eckert's actions

---

[30] Meadows also says that several of Eckert's family members are employed by Erie County in various capacities. *See* Docket Item 134 at 85.

were part of a "concerted effort or plan" concocted with police, prosecutors, or other government officials.  *See id.*

For the same reason, Meadows has failed to show that Eckert "[w]as a state actor engaged in a conspiracy with other state actors under section 1983."  *Young*, 705 F. Supp. 2d at 197.  That theory requires a plaintiff to show "(1) an agreement between the private party and state actors, (2) concerted acts to inflict an unconstitutional injury, and (3) an overt act in furtherance of the goal."  *Id.*  Although Meadows repeatedly asserts that all the defendants have conspired against her, *see* Docket Item 134, "[v]ague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed," *Young*, 705 F. Supp. 2d at 197.  And because the only facts that Meadows provides are not enough to show "an agreement" between Eckert and the state actors—much less "concerted acts to inflict an unconstitutional injury" upon her— Eckert is not a state actor for the purposes of section 1983.  *Id.*

Meadows's claims against Eckert for violation of her constitutional rights therefore are dismissed.[31]

---

[31] To the extent that Meadows intends to bring a malicious prosecution claim against Eckert, *see* Docket Item 134 at 64-67; Docket Item 139-1 at 7-8, that claim also is dismissed because she has not shown that Eckert was a state actor, *see Anilao v. Spota*, 340 F. Supp. 3d 224, 252 (E.D.N.Y. 2018) ("[T]o find a private defendant liable for malicious prosecution, [a] plaintiff must show that the defendant was acting under color of state law."), *aff'd*, 27 F.4th 855 (2d Cir. 2022).

### B.  42 U.S.C. §§ 1981 and 1982 Claims

Meadows also asserts claims against Eckert under 42 U.S.C. §§ 1981 and 1982.

Docket Item 134 at 3, 87-89.  Because those statutes have some common

requirements, they are analyzed together.[32]

Section 1981 protects the rights of all citizens "to make and enforce contracts, to

sue, be parties, give evidence, and to the full and equal benefit of all laws and

proceedings for the security of persons and property as is enjoyed by white citizens."

42 U.S.C. § 1981.   Section 1982 similarly protects the rights of all citizens to "inherit,

purchase, lease, sell, hold, and convey real and personal property," again "as is enjoyed

by white citizens."  *Id.* § 1982.  "To state a claim under [both section 1981 and section

1982], [a] plaintiff must show that [the] defendant[] deprived h[er] of h[er] rights due

directly to h[er] race."  *Waldron v. Rotzler*, 862 F. Supp. 763, 769 (N.D.N.Y. 1994).  To

do that, the "[p]laintiff must plead both the existence of racial animus and intentional

discrimination."  *Id.*; *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*,

140 S. Ct. 1009, 1019 (2020) (holding that under section 1981, "a plaintiff must initially

plead and ultimately prove that, but for race, [she] would not have suffered the loss of a

legally protected right"); *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 296

(S.D.N.Y. 2011) ("[F]act-specific allegations of a causal link between the defendant's

actions and the plaintiff's race are required" for a claim under section 1982, "and

conclusory or naked allegations will not suffice." (alterations, citation, and internal

quotation marks omitted)).

---

[32] This Court's previous decision contained a more detailed discussion of the
requirements for pleading a claim under each provision.  *See* Docket Item 127 at 18-20,
26-27.

This Court previously found that Meadows's section 1981 and 1982 claims were subject to dismissal because she failed to plausibly allege that Eckert deprived her of the rights protected by those sections based on her race. *See* Docket Item 127 at 18-20, 26-27. First, while Meadows asserts that Eckert's "racial animus" is shown by the latter's "reverse racism" statements on social media, *see* Docket Item 134 at 11, 88, those posts are not connected to any discriminatory acts that might be actionable under sections 1981 or 1982, *id.*, and fail to state a claim for the reasons explained in the Court's previous decision, *see* Docket Item 127 at 19-20, 25-27. And although Meadows states that "Eckert has isolated her attacks to only Black[]" people, she does not further elaborate on that statement or, again, tie it to the deprivation of any rights protected by sections 1981 and 1982. Docket Item 134 at 108.

Likewise, the other statements and conduct that Meadows adds to the amended complaint to show Eckert's racism are not connected to any discriminatory acts that might be actionable under sections 1981 or 1982 or, for that matter, to the factual allegations made against Eckert in the first half of the complaint. *Id.* at 108-12; *see id.* at 1-49. More specifically, although Meadows relates a series of alleged racist actions taken and statements made by Eckert, she does not relate them to Meadows's right to the full and equal benefit of all laws, to contract, or to own property—that is, the rights protected under those sections. *See id.*; *see also Sheikh v. Rabin*, 565 F. App'x 512, 518-19 (7th Cir. 2014) (holding that although the statements allegedly made by the plaintiff's neighbors were "troubling," the plaintiff's "failure to allege more than isolated acts of discrimination . . . doom[ed] his attempt to state claims under [section] 1982").

37

For those reasons, Meadows's claims against Eckert under sections 1981 and 1982 are dismissed.

### C.    42 U.S.C. §§ 1985 and 1986 Claims

Meadows also asserts claims against Eckert under 42 U.S.C. §§ 1985 and 1986. Docket Item 134 at 93, 98.

To bring a claim under section 1985, a plaintiff must allege

1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Britt v. Garcia*, 457 F.3d 264, 269 n.4 (2d Cir. 2006).  "A section 1985(3) conspiracy must also be motivated by some racial or . . . otherwise class-based, invidious discriminatory animus behind the conspirators' action."  *Id.* (citation and internal quotation marks omitted).  A claim under section 1986, which "imposes liability on an individual who has knowledge of discrimination prohibited under [section] 1985," is "contingent on a valid [section] 1985 claim."  *Graham v. Henderson*, 89 F.3d 75, 82 (2d Cir. 1996).

As this Court already has explained, *see supra* at 33-35, Meadows makes conclusory assertions about a conspiracy between Eckert and other defendants to deprive Meadows of her rights, but she pleads no facts to substantiate those claims. For that reason, she has not stated a viable claim under sections 1985 and 1986.  *See Wik v. Vill. of Holley*, 2023 WL 6958794, at *8 (W.D.N.Y. Oct. 20, 2023) (finding that "plaintiff's conspiracy claims, whether construed as [section] 1983 or [section] 1985 claims, fail[ed]" because he did not allege any "particular facts from which it could

plausibly be inferred that defendants had entered into an agreement to achieve unlawful ends").

### D.    FHA Claims

Meadows also alleges that Eckert violated section 3617 of the FHA.  Docket Item 134 at 91-98.  That statute

> provides that "it shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of [her] having exercised or enjoyed, or on account of [her] having aided and or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."[33]

*Birch Fam. Servs.*, 2021 WL 2312852, at *5 (alterations omitted) (quoting 42 U.S.C. § 3617).

"To prevail on a [s]ection 3617 claim, a plaintiff must show that: (1) she is a member of a protected class under the FHA, (2) she was engaged in the exercise or enjoyment of her fair housing rights, (3) [the] defendants were motivated in part by an intent to discriminate, and (4) [the] defendants coerced, threatened, intimidated[,] or

---

[33] As noted in the Court's previous decision, Docket Item 127 at 24 n.20, although section 3617 refers specifically to other sections of the FHA, courts "within and outside . . . the Second Circuit have held that [section] 3617 can serve as a separate and independent basis for an FHA claim" challenging conduct that occurred after the sale or lease of a dwelling "even if there is no predicate for liability" under the other sections to which section 3617 refers.  *Birch Family Servs.*, 2021 WL 2312852, at *6; *see also Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 88 (2d Cir. 2021) (Lohier, J., dissenting in part and concurring in part) ("[T]he plain language of [section] 3617 creates a separate cause of action that more comprehensively prohibits post-acquisition discriminatory conduct barred by [section] 3604(b)."); *but see id.* at 80 n.50 (majority opinion leaving open the extent to which "the FHA's prohibition of discrimination reaches conduct engaged in after a tenant acquires [a] dwelling").  This Court therefore assumes without deciding that Meadows's claims against Eckert, which all relate to conduct that occurred after Meadows moved into her home and do not arise out of any real estate transaction, relate to the sort of conduct that is protected under section 3617 of the FHA.

interfered with [the] plaintiff on account of her protected activity under the FHA." *Id.*
(alterations, citation, and internal quotation marks omitted); *see also Watters v.
Homeowners' Ass'n at Pres. at Bridgewater*, 48 F.4th 779, 785 (7th Cir. 2022) (same).

Not "every quarrel among neighbors" gives rise to a viable FHA claim. *See
Halprin v. Prairie Single Fam. Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th
Cir. 2004). "After all, isolated acts of racial animus are not enough; there must be some
nexus between a stray remark and the challenged action." *Watters*, 48 F.4th at 786
(alterations, citation, and internal quotation marks omitted). In other words, "even the
worst behavior toward one's neighbors requires some nexus to an adverse housing
action; otherwise, the claim is not actionable under the FHA." *Id.* at 791 (St. Eve, J.,
dissenting in part).

This Court previously found that Meadows had not alleged a nexus between any
racial animus and an adverse housing action, but it allowed her to amend her complaint
to state a viable claim. Docket Item 127 at 24-26. She has failed to do so.

Meadows asserts that Eckert has interfered in various ways with her "enjoyment"
of her "property." *See* Docket Item 134 at 91-98; *Birch Family Servs.*, 2021 WL
2312852, at *6 (reading section 3617 as "protect[ing] individuals from discrimination in
the mere enjoyment of their dwelling"). And Meadows says that Eckert interfered with
her property rights because of her race. *See* Docket Item 134. But other than what
Meadows previously alleged—which this Court already found to be insufficient, Docket
Item 127 at 25-26—Meadows does not include any facts that might support such a
finding, *see* Docket Items 44 and 134. Instead, as discussed elsewhere in this decision,
she argues that Eckert's racial animus is shown by her statements accusing Meadows

of "reverse racism," *id.* at 88, and other statements made by Eckert that are not connected to her factual allegations here, *see id.* at 108-112.  That is not enough. *Watters*, 48 F.4th at 786; *see also* Docket Item 127 at 24-26.

Because Meadows has failed to show any nexus between racial animus and an adverse housing action, Meadows's FHA claims are dismissed.

### E.    ADA Claims

Meadows also alleges that Eckert violated Meadows's rights under the ADA. Docket Item 134.  The Court noted in its previous decision that the basis for that claim is not entirely clear, although it seems to be rooted in Meadows's assertion that Eckert assaulted Meadows even though Eckert knew that Meadows was disabled.  *See* Docket Item 127 at 23.  The Court found that those facts did not plead a viable ADA claim, but it gave Meadows leave to amend.  Meadows now reasserts her ADA claim apparently based on that alleged assault as well as Eckert's attempt to expose Meadows to COVID-19.  *See* Docket Item 134 at 17-18, 71, 81, 91-92.

As this Court explained in its previous decision, the sort of private violence Meadows alleges here—while troubling—is not actionable under the ADA.  *See generally Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004).  "[The ADA] forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III."  *Id.*  "To prevail on a claim under the ADA, a plaintiff must establish, among other things, that [the] defendants are subject to one of the titles of the ADA." *See Wilshire v. L&M Dev. Partners*, 2022 WL 847067, at *3 (S.D.N.Y. Mar. 22, 2022).

Meadows has not alleged any facts to suggest that Eckert is subject to any of titles of the ADA.  Her claims under that statute therefore are dismissed.

### G.     Civil Rights Act Claims

Meadows says that she wants to add "Civil Rights Act [v]iolations" to the claims she asserted in her previous complaint, Docket Item 134 at 43, and therefore refers to "Title VII" several times in delineating her claims, *see id.* at 67, 76, 84, 93, 98, 118.  But the basis for those claims is not entirely clear, especially because "[n]on-employer individuals are not subject to liability under Title VII."  *Gill v. Mount Sinai Hosp.*, 160 F. App'x 43, 44 (2d Cir. 2005) (summary order) (citation and internal quotation marks omitted).  Therefore, and because Meadows does not allege that Eckert—or any of the defendants for that matter—was ever her employer, *see generally* Docket Item 134, she has not stated a viable Title VII claim, and those claims are dismissed.

### H.     Conspiracy Claims

Finally, Meadows alleges that Eckert engaged in a conspiracy with the other named defendants to "release [Meadows's] protected information" and to "commit battery."  Docket Item 134 at 82, 91-92 (bolding and capitalization omitted).  But as discussed above, Meadows does not allege facts sufficient to support her claims of conspiracy.  *See* Docket Item 134; *Young*, 705 F. Supp. 2d at 197.

## V.     LEAVE TO AMEND

Meadows has moved for leave to file supplemental pleading against the Erie County prosecutors and several other defendants based on comments made by Flynn at a press conference in March 2023.  Docket Item 151; *see* Docket Item 155

(supplemental pleading filed without leave of the Court).  Because those comments do not appear to concern the underlying factual allegations in Meadows's case in any way, *see* Docket Items 151 and 155, the Court denies Meadows's motion.[34]  And because, in light of Meadows's *pro se* status, this Court already has given her several opportunities to amend her complaint to state claims against the moving defendants, it declines to grant her any further leave to amend her claims.

## CONCLUSION

Meadows's motions for reconsideration, Docket Item 133; to strike, Docket Item 148; and for leave to file supplemental pleading, Docket Item 151, are DENIED. Eckert's motion to dismiss, Docket Item 139, and the Erie County defendants' motion to dismiss, Docket Item 141, are GRANTED, and Meadows's claims against those defendants are dismissed.  The Erie County defendants' motions to strike Meadows's amended complaint, Docket Item 141, and to strike Meadows's supplemental pleading, Docket Item 156, are DENIED as moot.

Meadows's motion to amend the complaint and for service by the United States Marshals Service, Docket Item 135, which was filed mistakenly in this case, is also DENIED without prejudice to the disposition of that motion in the correct case.

The Clerk of the Court shall terminate Eckert, Erie County, Flynn, Schoemick, and Gordon as defendants in this case.

---

[34] Because the Court denies Meadows leave to file supplemental pleading, the Erie County defendants' motion to strike the supplemental pleading that she nonetheless filed, Docket Item 156, is denied as moot.

SO ORDERED.

Dated:   March 14, 2024
         Buffalo, New York


                                        /s/ Lawrence J. Vilardo
                                       LAWRENCE J. VILARDO
                                       UNITED STATES DISTRICT JUDGE